UNITED STATES v. PARMENTER. See Case No. 14,756.

## Case No. 15,998.

UNITED STATES v. PARROTT et al.

[1 McAll. 271;[1] Hoff. Op. 234; 7 Morr. Min. Rep. 335.]

Circuit Court, N. D. California. July Term, 1858.

INJUNCTION AGAINST WASTE—PRACTICE—PARTIES —EQUITY JURISDICTION—DENIALS OF ANSWER —AFFIDAVITS—PUBLIC MINERAL LANDS.

1. On a motion for injunction to enjoin waste, the complainant cannot, on bill and answer, read affidavits in support of his title.

[Cited in Farmer v. Calvert Lithographing, etc., Co., Case No. 4,651.]

[1] [Reported by Cutler McAllister, Esq.]

2. The general rule is, that all persons interested in the object of the bill, are proper parties. There are qualifications to this rule; and the court will not suffer it to be so applied as to defeat the purposes of justice.

3. On a motion to dissolve an injunction, matters set up by way of avoidance in the answer responsive to the bill. should be deemed, on such motion, equivalent to an affidavit by the defendant. Such matters, on the final hearing, must be proved by the defendant.

4. The jurisdiction of this court is limited to certain persons and matters, but within those limits it can confer a remedy when a plain, adequate, and complete one cannot be had at law. In the exercise of its equity jurisdiction within those limits, it can afford relief where it can be afforded by the principles of the high court of chancery in England.

5. Injunction may issue to stay irreparable mischief or waste, in cases of disputed title.

[Cited in Le Roy v. Wright, Case No. 8,273.]

6. Where the answer denies, directly and positively upon personal knowledge, the allegations of the bill, it "denies the equity of the bill," and, acting upon it as evidence, the injunction will be dissolved by the court, in the absence of extraordinary circumstances.

7. Query:—Whether, in a case of irreparable mischief, the court will permit affidavits to be read in contradiction to positive denials of the answer?

8. Where fraud, forgery, and ante-dating are distinctly alleged in the bill, and the only denial of them is on "information and belief," it is not a "denial of the equity of the bill," and cannot arrest the issue of an injunction, or authorize a dissolution of it if one has been granted.

[Cited in Cole Silver Min. Co. v. Virginia & G. H. Water Co., Case No. 2,990.]

9. The working of a gold mine is the taking away the substance of the estate.

10. Mere insolvency, if inconsiderable, would not give jurisdiction to the court; but where the amount is great, and the inability of the party to respond is greatly disproportioned to that amount, such insolvency would be an element to influence the action of the court, and where it exists is proper subject for an allegation in the bill.

[Cited in brief in Dormueil v. Ward, 108 Ill. 216.]

11. The United States have not conveyed or dedicated the minerals in the public lands to individuals or the public.

[Cited in Lee Doon v. Tesh, 68 Cal. 48, 6 Pac. 97, and 8 Pac. 621.]

12. The institution of an action at common law, prior to the exhibition of a bill in equity, for injunction, is the general rule; but such action is not an indispensable prerequisite in all cases.

13. A court of equity will, in some cases, enjoin against the removal of the fruits of past waste.

The bill in this case is filed for an injunction, and the appointment of a receiver. The object is to restrain the working of a quicksilver mine, known as the "New Almaden," of the alleged value of $25,000,000 and from which defendants are extracting minerals to the annual value of $1,000,000. It alleges that the title under which defendants claim to hold possession, is derived from the Mexican government, and that the same, independently of all other defects, is forged and ante-dated. That defendants have, through

one Andres Castillero, in their own behalf, petitioned the board of land-commissioners organized under the act of congress of March 3, 1851, for a confirmation of their claim; which application is now pending on appeal before the district court of the United States for the Northern district of California. The bill prays for an injunction to enjoin the destruction of the mine until the title to it is determined by the tribunals to which its adjudication is finally confided.

P. Della Torre, Dist. Atty., Edmund Randolph, and E. H. Stanton, for the United States.

A. C. Peachey and Gregory Yale, for defendants.

Before McALLISTER and HOFFMAN, District Judges.

McALLISTER, District Judge. The magnitude of the interests involved, the novelty of this case in some of its features, the fact that the documentary title on which the defendants to a certain extent rely, was obtained from Mexico pending the war between that country and this, a few weeks prior to the occupation of this country by the American forces, the allegation that such documentary title was procured by a conspiracy to defraud the United States and was forged and ante-dated,—are circumstances which have invested this case with no ordinary interest outside these walls. That interest has been reflected upon those who have appeared in court as the representatives of the respective parties, as evidenced by the strenuous and zealous efforts which have been made by the respective counsel. This court is reminded by this condition of things, of the remarks of Chief Justice Marshall, in Mitchel v. U. S., 9 Pet. [34 U. S.] 723. "Though the hope of deciding causes to the mutual satisfaction of parties would be chimerical, that of convincing them that the case has been fully and fairly considered, that due attention has been given to the arguments of counsel, and that the best judgment of the court has been exercised on the case, may be sometimes indulged. Even this is not always attainable. In the excitement produced by ardent controversies, gentlemen view the same object through such different media that minds not unfrequently receive therefrom precisely opposite impressions. The court, however, must see with its own eyes, and exercise its own judgment, guided by its own reason." The present proceeding may be viewed as in the nature of an information on the part of the government through its law officer. It is a bill filed by the district attorney of the United States in their behalf. It sets out the title of the United States to certain premises; that defendants are in possession of said premises, which consists of a mine of vast value, and are extracting its minerals to an amount in value of $1,000,000 per annum, and have abstracted already minerals to the

amount of $8,000,000. It charges their possession to be tortious, and that the title under which defendants hold such possession was forged, false, antedated, and fabricated in pursuance of a conspiracy formed to cheat and defraud the United States of their rights to the said property; that defendants have filed a petition in the name of one Andres Castillero to the board of land-commissioners under the act of congress passed March 3, 1851 [9 Stat. 631], which is pending on appeal before the district court of the United States, for the Northern district of California, the object of which petition is to obtain from the United States a confirmation of the title which they pretend to hold from the Mexican government. It further alleges that defendants are destroying the substance of the mine, that they are unable to respond for the damages which have already accrued and still may accrue, and prays that an injunction may issue to stay the waste they are committing and threaten to commit, until the determination of the title by the tribunals to which the adjudication of it is confided by law shall take place, and that a receiver be appointed to take charge of the property intermediately.

This bill has been met by a demurrer and an answer. Double pleading in a court of equity is not allowable; and the answer in this case being a general one, overrules the demurrer upon the settled doctrine of the court. Taylor v. Luther [Case No. 13,796]. So that the demurrer may be dismissed without further observation, and the case stand on the bill and answer. Id. When the motion for injunction was made, the solicitors for defendants objected to any affidavit offered by complainants as to title. It was agreed that such affidavit might be read, and its admissibility argued on the discussion by counsel of the merits, and decided by the court in its opinion. Affidavits for defendant responsive to those on the part of complainants as to title, were admitted to be read, subject to the decision which should be made by the court on the admissibility of the complainants' affidavits to title. This motion for an injunction could be disposed of in a comparatively brief time; but the objections urged against the jurisdiction of the court, and to the character and form of this proceeding, have been numerous, and urged with so much zeal and apparent conviction in their correctness, that it is proper that special notice should be taken of them, in the hope of convincing parties that the court has "fairly considered the case, that due attention has been given to the arguments of counsel, and that the best judgment of the court has been exercised in the case."

The first question, then, is the admissibility of affidavits as to title, presented by defendants. The right of the plaintiff to read affidavits on a motion for injunction is declared to be a well-settled rule. It is his unquestionable right, say the court in Ken-

sler v. Clarke, 1 Rich. 620 [2 Hill (S. C.) 620], to read affidavits on an application for an injunction in the support of the allegations in his bill before the coming in of the answer; and as constituting a part of his case, they may be read on any subsequent motion to perpetuate or dissolve the injunction. But the court lays down the rule that no affidavits filed subsequently to the coming in of the answer can be read, for the reason it was calculated to surprise the defendant. The only exception to this rule of the right of plaintiff is to be found in the cases of waste and such as are analogous, for the purpose of preventing irreparable mischief; and that exception limits the affidavits to waste, insolvency, or other collateral fact, and does not permit them to extend to the question of title. This exception as to affidavits as to title was asserted by Lord Eldon in Morphett v. Jones, 19 Ves. 350, and in Norway v. Rowe, Id. 157; and seems to be recognized by the text-writers, by the case cited above from South Carolina, and by other decisions. Mr. Justice Story, in the case of Poor v. Carleton [Case No. 11,272], has intimated his doubts as to the existence of a good reason for the rule which denies the right of a complainant to read affidavits as to title, in a case of irreparable mischief; and the remarks of the learned judge upon the point are entitled to much consideration, and may lead hereafter to a qualification of the rule. The proposition for which he contends is, that affidavits to title should upon general principles be looked to, not for the purpose of establishing title, but to enable the court to see if probable foundation existed to believe that the complainant may establish his title and be liable intermediately to irreparable injury. In the case of Tobin v. Walkinshaw [Id. 14,068], decided by this court, it went into a full consideration of the case of Poor v. Carleton [supra]; and inasmuch as the point was not directly before the court in that case, and the learned judge in that case admitted that affidavits to title were only to be looked to for a qualified purpose, considering too, as well settled, that on a motion for an injunction a court of equity is not to look into title, this court came to the conclusion it would be better to adhere to the ancient rule until qualified by some authoritative decision directly on the point. The court, therefore, decided that affidavits to title could not be read. The law announced in that case must be applied to the present, and so much of the affidavits of plaintiff in this case as goes to title must be discarded by the court in the adjudication of this motion. The affidavits of the defendants, which were admitted to be read as responsive to plaintiff's affidavits, must be also rejected. As the court excludes the plaintiff's, on a consideration of the question of their admissibility, which by consent of parties when they were read

was reserved for its decision, the affidavits of the defendants must share the same fate. The only ground on which they could be received was, that they were responsive to the affidavits of complainant as to title. In the absence of any such, no rule is better settled than that defendants cannot read affidavits to support their answer. 1 Hoff. Ch. Prac. 360; Roberts v. Anderson, 2 Johns. Ch. 202; 2 Hill (S. C.) 620. In the language of Lord Eldon, in Norway v. Rowe, 19 Ves. 157, "the title must be taken on the answer." The case, therefore, is to be discussed on the pleadings—the allegations in the bill as verified by the affidavits accompanying them, exclusive of any portion of them which go to title, and the denials in the answer.

A preliminary inquiry is, as to the jurisdiction of the court as to the parties. The decision of this court in the case of Tobin v. Walkinshaw [supra] has been cited as an authority which settles the question raised in favor of the objection taken by the defendants' counsel to the jurisdiction of this court, on the ground of want of parties. A reference to the structure of the bill in that case and in this, will show that, whatever may have been the language of the court arguendo in that case, it can not be cited as an authority in the present. In that case, it was alleged that defendants held under a conveyance from one Andres Castillero. There was no allegation that he was beyond the jurisdiction of this court, nor any prayer that he might be brought into court, should he at any time come within the reach of its process. It prayed for the cancellation of deeds in the hands of absent persons; it prayed for an account of all the profits of the mine for the preceding year, and for a perpetual injunction. By the subsequent pleadings it was ascertained, that two persons resident in this city, within the jurisdiction of this court, equally interested with defendants, were not made partes to the bill. It was in relation to such a bill the court said: "But the bill asks, that an account of profits belonging to other people be taken, and title-deeds to property in which those other and absent persons are as much interested and to a larger extent than the defendants themselves, shall be canceled." The court further said: "But there is one feature in this case which distinguishes it from all others. It is, that two absent persons (Parrott and Bolton), whose interests would be affected by a decree, are residents of this city, and within the reach of the process of this court. But if by bringing them before the court, this case would be beyond the jurisdiction of this court, can the court by indirection adjudicate upon their rights, and thus do indirectly what it could not do directly?"

Now, the present bill makes all persons in interest, within the reach of the process of the court, parties to the bill. It alleges, that certain persons who are absent from this state hold possession of the mine, by the de-

fendants as their agents, and prays, if they come within the jurisdiction of this court, they may be made parties. It asks for the delivery and cancellation of no deeds, nor any account of profits. It asks from the defendants the value of the ore extracted and carried away by either of them, or by any other person with license and consent of them, or either of them, while in possession, as alleged wrongdoers, of the premises. It alleges, that under the act of March 3, 1851, entitled "An act to ascertain and settle private land-claims in the state of California," a petition in conformity with the provisions of that act has been submitted to the board of land-commissioners in the name of one Andres Castillero, for and in behalf of defendants, asking for a confirmation of the claim to the premises in dispute held under a Mexican title; which proceeding is pending on appeal before the district court of the United States for the Northern district of California, before which tribunal the alleged title of the premises is now awaiting adjudication. The bill prays for an injunction to enjoin the destruction of the premises before the termination of that adjudication.

The averment of the answer which raises the objection to the jurisdiction is, that certain persons resident in foreign countries are associated with defendants, and the names of some of them are unknown. The lands and mine are admitted to be in possession of the agents of the company of which the said non-residents are parties. The question presented is, whether where the parties are prosecuting a claim in the district court by their attorneys, and holding possession and enjoying the proceeds of the premises by their agents, the court has the power to protect the property, or is deprived of that power because some of the parties are without the jurisdiction of the court. The affirmative of this proposition, if sustained, would be attended with singular results. It would only be necessary for parties to associate themselves with foreign parties who were beyond the process of this court, and entire exclusion from any equitable relief required by others who may have rights to or claims on the property in their possession, would be the result. The general rule in a court of equity is, that all persons who are interested in the object of the bill are necessary and proper parties. There are exceptions to this rule, which are governed by one and the same principle, which is— as the object of the general rule is—to accomplish the purposes of justice between all the parties in interest; and it is a rule founded in some sort upon public convenience and policy, rather than upon positive municipal or general jurisprudence. Courts of equity will not suffer it to be so applied as to defeat the very purposes of justice, if they can dispose of the merits of the case before them without prejudice to the rights of other persons who are not parties, or if the circumstances of the case render the application of the rule impracticable. Story, Eq. Pl. § 77. The first exception to the rule stated by Judge Story is founded upon the utter impracticability of making the necessary or proper parties, by reason of their being beyond the process of the court. Id. § 79. This ground of exception is peculiarly applicable to suits in equity in the courts of the United States. If, therefore, this rule as to parties were of universal application, many suits in those courts would be incapable of being sustained therein; and Judge Story states that the general rule in the courts of the United States, is to dispense, if consistently with the merits of a case it can possibly be done, with all parties over whom the court would not possess jurisdiction. Id. § 79. Parties to bills are divided into three classes—nominal, necessary, and indispensable. The act of congress of February 28, 1839 (5 Stat. 321), and the 47th rule of equity of the circuit courts of the United States, were enacted to remove the disability alluded to by Judge Story, in the circuit courts, in the administration of justice, where some of the parties were beyond the jurisdiction of the court. The judicial construction placed upon those enactments is, that they have dispensed with the duty of making nominal or necessary parties where it is impracticable to do so by reason of their being beyond the reach of the process of the court; but the presence of an indispensable party is as necessary to the jurisdiction of the court as it was before the enactment of the rule and the law. The presence of an indispensable party is demanded by the consideration that no court of equity, however general its jurisdiction, can adjudicate directly upon the rights of a party unless he is actually or constructively present. [Mallow v. Hinde] 12 Wheat. [25 U. S.] 194. The absent parties are undoubtedly necessary parties, and had they been within reach of the process of this court, must have been made parties to the record. But are they, under the circumstances, so indispensable as parties, as to prevent any decree by this court?

In this case it is alleged in the bill, that certain parties reside out of the jurisdiction of this court; and it prays that they may be made parties whenever they shall be found within its jurisdiction, in conformity with the 22d rule of equity. The answer admits that they reside beyond the jurisdiction of the court, and the names of some of them are unknown to defendants. It admits the possession of the property by the agents of those absent parties, which agents are made parties to this bill. The same parties are in the district court prosecuting a claim to the same property in the name of Andres Castillero against the plaintiffs. No act is required to be done by these parties. They are before the district court, where their rights in the property are to be adjudicated. Not

actually, they are constructively present on this motion.

In the case of Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738, the bill was against, and the decree was rendered against, an individual who was the agent of another, who was not a party to the bill, being a sovereign state, and who could not be made a party. The objection in that case was, that as the real party cannot be brought before the court, a suit could not be sustained against the agents of that party. "Why," ask the court (page 843), "may not it (this court) restrain him from the commission of a wrong which it would punish him for committing?" The case of Osborn v. U. S. Bank was a demand for money of the principal in the hands of an agent, which belonged to a principal not a party to the record. Hence, this court in its opinion in the case of Tobin v. Walkinshaw [Case No. 14,068], in commenting on that, state as one of the grounds of difference that in the case of Tobin v. Walkinshaw "there is no question of principal and agent in this case."

There would seem to be no reason to restrain the court from acting, for want of parties. To do so in this case, would be a denial of justice. The parties, while using another judicial tribunal for the confirmation of their alleged title, would be enabled by reason of the absence of some of them without the jurisdiction, to bar the party against whom they are prosecuting their claim to the property, from the interposition of this court to preserve and protect that property pending such prosecution. The foreign parties would thus be making use of an American tribunal to enforce their claim, while they availed themselves of their absence to preclude the complainants from a right to which the humblest individual is entitled,— to invoke an injunction for the preservation of the property; for only to that extent can the action of this court go. Judge Story lays down the ordinary rule to be, that where the persons who are out of the jurisdiction are mere passive objects of the judgment of the court, or their rights are merely incidental to those of the parties before the court, then, inasmuch as a complete decree may be obtained without them, they may be dispensed with. If such absent persons are to be active in the performance and execution of the decree, or if they have rights wholly distinct from those of other parties, or if the decree ought to be pursued against them, they are indispensable. Story, Eq. Pl. § 81. Speaking of a defect for want of parties, this author says: "In many instances the objection will be fatal to the whole suit. In others, it will not prevent the court from proceeding to the decision of other questions between the parties actually before it, even though such a decision may incidentally touch upon or question the rights of the absent parties." Id. In Smith v. Hibernian Mine Co., 1 Schoales & L. 238, Lord Redesdale says: "The ordinary practice of courts of equity in England, when one party is out of the jurisdiction and other parties within it, is to charge the fact in the bill; and then the court proceeds against the other parties, notwithstanding he is not before it. It cannot proceed to compel him to do any act, but it can proceed against the other parties; and if the disposition of the property is in the power of the other parties, the court may act upon it." "I remember" (says the chancellor), "a case where a bill was filed to sell an estate for payment of debts, and the heir at law who was entitled to the surplus after payment of debts, was out of the jurisdiction. The court ordered the estate to be sold for the payment of debts; the heir (say the court) might file a bill to set aside the proceedings if they were erroneous."

In the case at bar, no act is required to be performed by the absent parties in the execution of the decree; their interests are incidental only to those of defendants, and they are passive parties; the possession of the property is in them by their agents. They may come into this court at any time; they are, in the name of Castillero, prosecuting for the confirmation of their claim to the property in the hands of their agents, the defendants. The case of Coiron v. Millaudon, 19 How. [60 U. S.] 113, has been cited by defendants' solicitors. In that case, the bill was filed to set aside a sale of property on the ground of irregularities in insolvent proceedings. If the sale were set aside, the defendants would have been enabled to recover from the creditors who had received their money. The court say: "The creditors, therefore, are the parties chiefly concerned in these proceedings, and as it respects those to whom the proceeds of the estate have been distributed, they are directly interested in upholding the sale; for if it is set aside, and the proceedings declared a nullity, they would be liable to refund the share of the purchase-money each one had received in the distribution." This latter case simply affirms the principle announced in Mallow v. Hinde, 12 Wheat. [25 U. S.] 194, and in Tobin v. Walkinshaw, decided by this court, that indispensable parties, as they were considered in those cases to have been, could not be dispensed with.

We cannot consider the objection to the jurisdiction for the want of parties as tenable.

Whether the answer should be regarded on this motion more than an affidavit, is the next question which has been raised. The ancient doctrine may be as contended for by the solicitors of complainants; but we think that upon the ground of reason and more recent authority, all direct denials in the answer responsive to the allegations of the bill, and not matters of avoidance, ought to have the effect of an answer as evidence on this motion as on a final hearing. On a motion to dissolve an injunction, Mr. Justice

Story says: The ground of "dissolving an injunction upon a full denial by the answer of the material facts is, that in such a case the court gives entire credit to the answer, upon the common rule in equity, that it is to prevail, if responsive to the charges of the bill, until it is overcome by the testimony of two witnesses, or of one and other stringent corroborative circumstances." Poor v. Carleton [Case No. 11,272]. It is evident, then, that Judge Story considered that even on a motion to dissolve an injunction, the same effect was to be given to the answer as is to be given to it on the hearing.

As to the effect to be given to matters set up in the answer by way of avoidance, there has been some conflict of authority. In New York, South Carolina and New Jersey, the doctrine is well settled that matter of avoidance set out in the answer responsive to the allegations in the bill, is to be considered as equivalent to an affidavit on a motion for injunction. In Maryland and Georgia, a contrary doctrine obtains. In the former state (3 Bland, 162), while enforcing their view of the rule, the court did so upon a single authority in Bardiston's Chancery Reports, one hundred and thirty years old; and the Maryland court say "that the rule was not mentioned in any English digest, compilation, or book, other than that book." The court in Georgia (1 Kelly, 7), relied solely for their construction on the case of Hart v. Ten Eyck, 2 Johns. Ch. 63. But the decision in this case has been repeatedly reversed in New York. [1 Paige, 239; 2 Sanf. 673] [2]

As to the effect of the answer, then, in this case, the court considers that, on this motion, the denials made in it on personal knowledge, direct and responsive to the bill, are to receive the consideration due to them as if it was on the hearing, but that matters set up by way of avoidance are to be received as affidavits. As this question was raised at the bar, it is deemed proper to dispose of it, were it only to settle the practice of this court in view of the conflict of authority which exists.

The next subject of inquiry is the objection made to the jurisdiction of the court, by reason of the subject-matter. It is urged that its jurisdiction is special and limited, and does not extend its aid in an auxiliary proceeding to a court not governed by the principles of the common law. That this proceeding is auxiliary, and not the exercise of original jurisdiction, and is dependent upon that now exercised by the district court under the act of 1851. That the suit must be depending in a common-law court, and between the same parties; and the case of Clarke v. Mathewson, 12 Pet. [37 U. S.] 164, and that of Dunlap v. Stetson [Case No. 4,-164], are cited to sustain these propositions. These cases were decided upon the question

of jurisdiction as to the want of parties. Nothing was before the court as to jurisdiction as to the subject-matter. It had been decided by Judge Story (Clarke v. Mathewson [Id. 2,857]) that a bill of revivor, being a suit between the citizens of the same state, the court had no jurisdiction. On appeal to the supreme court, in Clarke v. Mathewson, 12 Pet. [37 U. S.] 164, they reversed the decision of the court below; and all that was decided was that a bill of revivor was not an original bill, but a mere continuation of it, and if the plaintiff in the original suit was competent to sue in the circuit court, his administrator, though a citizen of the same state with defendant, might revive the suit, the two bills being considered one and the same case. The case cited, Dunlap v. Stetson [supra], related also to the jurisdiction as to parties, the point being whether the suit could be sustained, the defendant being a citizen of Massachusetts, and not resident in Maine, and the subpoena having been served upon him in Massachusetts; and the decision was, that injunction would be issued by the court to enjoin a judgment obtained in the same court, although the original plaintiff is a citizen of another state, and this upon the ground that the injunction bill was part of the original bill. The court cannot consider that these cases, which were decided on the question of jurisdiction under section 11 of the judiciary act, have any bearing on the jurisdiction as to subject-matter. They decide that an injunction bill is part of the original bill it seeks to enjoin, and that in the issue of it the court is not in the exercise of original jurisdiction; and they predicate the same decree of a bill of revivor. But what is the jurisdiction of this court as to the subject-matter, they do not establish. This must be done by reference to the constitution, acts of congress, and the judicial construction they have received. There is no doubt that the jurisdiction of the circuit courts of the United States is limited to certain persons and subjects, but within those limits is the same in every state, and complete and full. The constitution provides (article 3, § 2) that the judicial power shall extend to all cases in law or equity specified therein, among which are enumerated "controversies to which the United States shall be a party." The judiciary act of 1789 (1 Stat. 78) enacts, that the circuit courts shall have original cognizance with the courts of the several states, of all suits at common law and in equity, where the matter in dispute exceeds the sum of five hundred dollars, and the United States are plaintiffs or petitioners. By the act organizing this court (10 Stat. 631), it is declared, that the court organized thereby, "shall in all things have and exercise the same jurisdiction as is vested in the circuit courts of the United States, as organized under existing laws." The jurisdiction of the circuit courts of the United States, is thus summed up by the

[2] [From Hoff. Op. p. 234.]

supreme court in Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 563: "Chancery jurisdiction is conferred on the courts of the United States, with the limitation that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate, and complete remedy may be had at law." The supreme court has placed in several cases a judicial construction upon these words. In Boyce v. Grundy, 3 Pet. [28 U. S.] 210, they say, that the words "plain, adequate, and complete" were declaratory, making no alteration in the rules as to equitable remedies. In Robinson v. Campbell, 3 Wheat. [16 U. S.] 212, that to determine the signification of these words, resort must be had to the principles of the common law of England, and not to the laws of the state where the court sits; and that if the state law has given a legal remedy for an equitable right, the jurisdiction of the circuit court is not affected; and that to bar a suit in equity, the remedy at law must be as efficient to the ends of justice and its complete and prompt administration, as the remedy in equity. Boyce v. Grundy, 3 Pet. [28 U. S.] 210.

It is difficult to see how, under the constitution, the judiciary act, and the judicial constructions given, it can be successfully urged that the circuit courts within the limits prescribed as to persons and subjects, have not a complete and full equity jurisdiction. In this case the court has jurisdiction as to parties, because the United States are plaintiffs. They have jurisdiction of the subject-matter because it exceeds the amount in value prescribed by law, and because there is no "plain, adequate, and complete remedy" for the injury complained of. Whether in affording the relief, they exercise original or auxiliary jurisdiction, has nothing to do with the question, unless an inquiry should arise where a party whose citizenship does not entitle him to invoke the original jurisdiction of the federal courts attempts to do so. The jurisdiction of the circuit courts of the United States has been defined by the supreme court. In Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 563, the supreme court say: "The rules of the high court of chancery have been adopted by the courts of the United States, and there is no other limitation to the exercise of a chancery jurisdiction by these courts, except the value of the matter in controversy, the residence or character of the parties, or a claim which arises under a law of the United States. In exercising this jurisdiction, the courts of the Union are not limited by the chancery system adopted by any state, and they exercise their functions in a state where no court of chancery has been established. The usage of the high court of chancery in England, whenever the jurisdiction is exercised, governs the proceedings. This may be said to be the common law of the country, and since the organ-

ization of the government, has been observed. Under this system, where relief can be given, similar relief may be given by the courts of the Union." We cannot, therefore consider the objection to the jurisdiction of this court as to the subject-matter available. In granting the relief prayed for, it has all the powers of the English chancery.

We have seen that within the limits of their jurisdiction as to persons and subject-matter, the only restriction upon their equity powers is, that there be no plain or adequate remedy at law. Have the plaintiffs such complete remedy at law as should bar this suit? The rule is, that the party may come into equity, although he has a remedy at law: if such remedy be not plain, complete and adequate, a fortiori, if he has no remedy at law, he is entitled to the aid of a court of equity. The protection of the mine is the object contemplated by this bill; the preservation of its substance, until the title to it is ascertained by the tribunals to which the question is exclusively confided, is the prayer of the bill. That tribunal has no jurisdiction as to waste or destructive trespass. The title is the only question left to their decision. They have no power to save the property from destruction; and if this court possess none, complainants are without remedy. The administration of justice can neither be "complete nor prompt."

Stress has been placed upon the fact that previously to the institution of this bill, no action at common law has been instituted by complainants. It is urged that such step was necessarily preliminary to the filing of this bill, and the very form of the action is prescribed. Now in the ordinary course of things, where one claims title to real estate, his first step ordinarily is to enforce his claim in one of the ordinary courts of justice, in the form of an action of trespass to try title, or one of ejectment. The limited jurisdiction of a court of law may render it necessary that he should have the interposition of a court of equity to obtain a discovery in aid of his common-law suit; or he may have a defense equitable in character, of which he could not avail himself in a court of law; or the plaintiff may be attempting to avail himself of a legal title inequitably; and in many other instances it may be necessary to invoke the jurisdiction of equity. The fact that a party has not taken this usual step is matter of suspicion, and clearly shows, where no reasons exist for the omission, the want of that diligence the law requires from parties in the pursuit of their alleged rights. Hence, we find frequent allusions in the cases to the fact whether the party has instituted his action at law before he came into equity; and in a certain class of cases, the courts have refused to interfere when an action at law has not been brought. The rule is, however, by no means universal. That the institution

of an action at common law is an indispensable pre-requisite in all cases to the institution of a bill for an injunction, cannot be admitted. No case has been cited, which has made the omission of a party to have previously instituted a suit at law, the sole ground for refusing an injunction, where fraud was alleged and irreparable mischief the injury sought to be remedied. But the reasons for the ordinary rule do not exist in this case; and the maxim "Cessante ratione cessat et ipsa lex," must apply.

There is a pending litigation between complainants and Andres Castillero, under whom defendants claim, and in whose name they are, in their own behalf and that of their associates in interest, now prosecuting the title to the premises in dispute. To protect the substance of that property pending that litigation, is the object of this bill. The objection is, that such litigation must be pending in a particular form, and in a court of common law. We do not consider this proposition correct, and the cases where the courts of chancery in England have interposed to protect property in litigation in the ecclesiastical courts, disaffirm that doctrine. To these we shall hereafter refer. For the present we will inquire whether, under the peculiar circumstances of this case, the omission of the complainants to have instituted an action in a court of common law to try title, is sufficient to defeat the present application. It is true, the United States hold a legal title to the premises. Suppose that, counting upon that title, they had sued for the recovery of the possession, might not the defendants in that suit have pleaded to the action the act of congress passed 3d March, 1851, entitled "An act to ascertain and settle the private land-claims in the state of California," and their proceedings under it pending in the district court? By that act the United States are bound to hold their title subservient to the adjudication of special tribunals, with rules of decision very different from those which obtain in the ordinary tribunals of the country. An attempt on the part of the United States, so long as that act is unrepealed, to avail of their legal title in a court of common law, would have been inequitable and unjust. They have made no such attempt. They do not propose to do so, by this bill, further than as they allege it is necessary, in order to preserve the property until the question of title is determined as provided for by law. The fact that they have made their title dependent upon the action of special tribunals, and thus have deprived themselves of the right to enforce it at common law, cannot bar them from enforcing their equitable right to prevent the destruction of the property, on the ground that they had not previously to their application brought an action at common law to enforce that title.

Another objection to the relief prayed for

is, that an injunction cannot be granted to enjoin a trespass where the title is disputed. In a case of mere trespass, or a technical waste where the mischief is not imminent, where no equitable circumstances appear, and no fraud alleged, and where the title of plaintiff is disputed in the manner prescribed by law, the rule is correctly stated. Where the mischief sought to be protected against is irreparable and imminent; where the bill alleges fraud and antedating in the execution of the title-papers set up by the defendants, and their genuineness is affirmed only on information and belief,—the case does not exist, to the knowledge of this court, where the rule contended for is to be literally applied. No one of the cases cited by the solicitor for defendants reaches this case. The authorities are numerous. To comment upon them in detail would be an unconscionable consumption of time.

The strongest case cited from the English authorities is that of Pillsworth v. Hopton, 6 Ves. 51; and from the American, those of Storm v. Mann, 4 Johns. Ch. 21, and Perry v. Parker [Case No. 11,010]. In the former case, the lord chancellor said: "I do not recollect that the court ever granted an injunction under any such circumstances." The character of the waste is not mentioned; and his lordship concluded by saying: "I remember perfectly, being told from the bench very early in my life, that if the plaintiff filed a bill for an account, and an injunction to restrain waste, stating that the defendant claimed by a title adverse to his, he stated himself out of court." Now, this parol authority which his lordship applied to that case, decided in 1801, must have carried back his memory to about the middle of the eighteenth century. In 1837, nearly a century afterwards, Judge Story says: "Indeed, there are numerous cases which show the gradual meliorations or changes, often silent and almost unperceived, which have been introduced into the practice of the courts of equity, to obviate the inconveniences which experience has demonstrated, and to adapt the remedial justice of these courts to the new exigencies of society." The learned jurist adverts to an instance by way of illustration; and, in a subsequent part of his opinion, alludes to the qualification of the doctrine which existed, that affidavits could not be read in support of the title of the plaintiff, which is contradicted by the answer. "I cannot well see," said he, "why the court, to prevent irreparable mischief, may not look to affidavits in affirmance of the plaintiff's title, not so much with a view to establish that title, but to see whether it has such probable foundation in the present stage of the cause, as to entitle the plaintiff to be protected against irreparable mischief, if upon the hearing it should turn out to be well founded." Judge Story has alluded to the proposition laid down by the chancellor in the case of Pills-

worth v. Hopton, and says: "The interference of courts of equity in restraint of waste may have been originally confined to cases founded in privity of title; and for the plaintiff to state a case in which the defendant pretended that the plaintiff was not entitled to the estate, or in which the defendant was asserted to claim under the adverse right, was said to be for the plaintiff to state himself out of court. But at present the courts have by insensible degrees enlarged the jurisdiction to reach cases of adverse claims and rights not founded on privity, as for instance, to cases of trespass with irreparable mischief." Story, Eq. Jur. § 918. In Pillsworth v. Hopton, it is also to be observed that the plaintiff had failed in an ejectment suit he had brought; and further, there was no equitable circumstance calling for the interposition of a court of equity. In the second case, that of Storm v. Mann, 4 Johns. Ch. 21, decided in 1819, cited to sustain the general proposition as to dispute of title, the defendant had been for a long time, and was at the time, in possession; the nature of the waste is not stated, and no special ground was taken for equitable relief, nor any explanation made for the delay. The principle asserted in this case is, that a court of equity will not interfere where rights are properly determinable in a court of law where an adequate remedy can be found. In this case, the court referred to the case of Pillsworth v. Hopton, above referred to, as an authority for saying, "If the plaintiff in his bill states an adverse claim in the defendant, he states himself out of court." We have seen the views of Judge Story on this point; and it is extraordinary that the principle ever should have been asserted in any case in such general terms, that a party setting forth an adverse claim in the bill states himself out of court.

There are few cases which can be imagined where one enters upon land and exercises acts of ownership, that he cannot be said in common parlance to dispute the title of the owner so soon as he is known to him. We shall see, by reference to authority, that no such principle now exists. The last American case cited, is that of Perry v. Parker [Case No. 11,010]. The bill in this case was to enjoin the cutting of the dam and gates of the complainant; and Mr. Justice Woodbury, after noticing the cases in which injunction has been refused on the ground of the right being disputed, says: "Some cases of necessity, where the danger is great and the injury irreparable, may in England be regarded as exceptions;" and he refers to several cases decided in the high court of chancery. It is to be observed that in this case there was no fraud alleged, no irreparable mischief suggested, nor other equitable circumstances. The judge, in the absence of them, refused the injunction. But he states, after alluding to the exceptions in England, his own convictions as to ,the law. "And I am inclined to hold," he said, "that a mere denial of title is never sufficient, as such denial may be made for delay and mischief, unless as before remarked it is accompanied by circumstances showing it to be in good faith." If a denial unaccompanied by other circumstances is never sufficient, it seems that a denial on mere "information and belief" as in this case, of the charges of fraud, forgery, and antedating made against the documentary title of defendants, would be insufficient. A careful examination of all the authorities cited by defendant only shows, in the opinion of the court, that in the case of common trespass, in the absence of equitable circumstances, an injunction will not issue if the title of plaintiff is disputed; that the pendency of a suit is not of itself a ground for the interference of a court of equity; that a party may by laches, or delay unaccounted for, or by an omission to bring an action at law, there being no reason for the omission, deprive himself of the right to the interposition of a court of equity. There is no one of those cases which assert that a party by simply disputing plaintiff's title can defeat his application, in a case resembling the present.

The true rule will be found by referring to the English and American authorities. That decisions directly in point, on either side, are to be found to every part of this case, is not to be expected. It is novel in some of its features. But a new case does not create necessarily a new principle. Chief Justice Marshall, in Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 841, stated: "The appellants admit that injunctions are often awarded for the protection of parties in the enjoyment of a franchise; but deny that one has ever been granted in such a case as this. But, although the precise case may never have occurred, if the same principle applies the same remedy ought to be afforded." Principles have been enunciated both in England and this country, the application of which will dissipate all difficulty arising from the novelty of this case. Lord Redesdale, than whom there is no higher authority, and of whom the court say, in Bogardus v. Trinity Church, 4 Paige, 195, "His opinion upon a case of equity pleadings is always esteemed the highest authority," and in England where his treatise is received by the whole profession, "as an authoritative standard and guide," is clear and full upon this point. This author, in enumerating the general objects of the jurisdiction of a court of equity, includes the following: (1) Where the principles of law by which the ordinary courts are guided, give a right, but the powers of those courts are not sufficient to afford a complete remedy, or their modes of proceeding are inadequate to the purpose. (2) Where the principles of law by which the ordinary

courts are guided, give no right, but, upon the principles of universal justice, the interference of the judicial power is necessary to prevent a wrong, and the positive law is silent. (3) To provide for the safety of property in dispute pending a litigation, and to preserve property in danger of being dissipated or destroyed by those to whose care it is by law entrusted, or by persons having immediate but partial interests. Mitf. Ch. Pl. 111. Again, he lays down the rule that, "pending a litigation, the property in dispute is often in danger of being lost or injured, and in such cases a court of equity will interfere to preserve it, if the powers of the court in which the litigation is depending are insufficient for the purpose." Thus, during a suit in an ecclesiastical court, for administration of the effects of a person dead, a court of equity will entertain a suit for the mere preservation of the property of the deceased till the litigation is determined, although the ecclesiastical court, by granting an administration pendente lite, will provide for the collection of the effects. Id. 158.

In Daniell's Chancery Practice, it is stated, that "an injunction will be granted in some cases where the parties have both legal titles and legal remedies, but irreparable mischief would be done unless they were entitled to more immediate relief than that which they could obtain at law; it has accordingly been granted, when the injunction amounted in fact to an injunction to stop a trespass; for if the court would not interfere against a trespasser, he might go on by repeated acts of damage which would be absolutely irremediable." The author refers to Flamang's Case [cited in 6 Ves. 147], in which Lord Thurlow refused to enjoin a mere trespass; but subsequently changed his opinion, on the ground that irreparable mischief would follow his refusal; holding, in effect, that if the defendant was using the substance of the thing, the liberty of bringing an action was not the only remedy to which in equity he was entitled; and the author concludes: "The same principle has been acted on and applied without scruple, in various other decisions; for unless there was a jurisdiction to prevent destruction or irreparable mischief, there would be a great want of justice in the country." 3 Daniell, Ch. Prac. 1854.

The foregoing are the expositions of the general doctrine by two standard text-writers; and they presuppose that the property sought to be protected was in dispute. In Poor v. Carleton [supra], Mr. Story does not confine himself to the question of title as raised upon the pleadings, but is of opinion that affidavits as to title ought, on general principles, to be permitted to be read. Whence the necessity, in any case, of reading affidavits as to title of plaintiff, unless upon the ground that such title has been disputed? The authorities which exclude

affidavits to title do not do so upon the ground that defendant has disputed the title of plaintiff, but because the court has no jurisdiction to establish title between the parties. In U. S. v. Gear, 3 How. [44 U. S.] 120, the defendant had been sued in two actions, at law and in equity, and they involved his right to a tract of land upon which there was a lead mine. The first was an action of trespass, and the second a bill in chancery to stay waste, on the equity side. The defendant by his pleas to the common-law suit, raised the question of title. The same question was raised in the equity cause. Both cases were carried up, on a division of opinion between the judges, to the supreme court. Among other questions raised in the equity cause, was the right of complainant to an injunction; which was granted. In Kinsler v. Clarke, 1 Rich. 617 [2 Hill, 617],[3] a bill was filed for an injunction to restrain from waste or cutting timber. The defendant insisted in his answer that he had a perfect title to the premises, and set it out. The chancellor, in his decree, discussed the question of right, and decided in plaintiff's favor, and ordered an injunction to issue. On an appeal (Chancellors Johnson, Harper, and De Saussure, justices), the court declined to decree on the question of title, but sustained that portion of the chancellor's opinion which went to the issue of an injunction. "The claim," said Chancellor De Saussure, "of both parties to the title was set forth in the pleadings; and the chancellor on the circuit, to put an end to litigation and the multiplicity of suits, made a decree on the question of right. But, as this court is unwilling to decide on the question of title, which is pending in a suit at law, it will make no decree on the appeal on that ground, but will leave the parties to the litigation of the title to the court of law, to which the court remits them." The court confined itself to the appeal from the decree of the chancellor granting an injunction. The appeal was made on the ground, that in a case of trespass no injunction ought to be granted. Neither the chancellor below nor the appellate tribunal considered, that the right of complainant to an injunction was defeated by defendant disputing the title, and setting up in his answer an adverse one. The court of appeals say (De Saussure delivering the opinion): "On a careful examination, I concur entirely with him, in directing an injunction to be issued in this case. He has placed the interposition of the court for the protection of the land in question from irreparable mischief, on the true grounds; and I entirely concur with him. Nor is this doctrine and practice new in England or in this country."

The court cannot believe, in view of the foregoing authorities, that no injunction can

---

[3] [From Hoff. Op. 234.]

in any case be granted where the title is disputed, in a case of trespass of the character complained of in this case.

Thus far the attention of the court has been limited to the objections urged by defendant's solicitors to the jurisdiction of the court and the mode of procedure. The remaining question is one raised by one of the grounds of defense taken, viz. that the defendants are protected by the answer. This is a substantial defense. It is the ordinary question which arises on a motion for an injunction, or to dissolve an injunction (if previously granted), on bill and answer. A decision of it covers the whole merits of this motion. When an answer denies directly and positively from personal knowledge the material allegations of the bill, it "denies the equity of the bill," and the court is bound to consider it as evidence to which entire credit is to be given, until disproved by two witnesses, or one with stringent corroborative circumstances. Acting upon it as such, the court, in the absence of extraordinary circumstances, will dissolve the injunction if previously granted. If, on the contrary, such denials are not or cannot be made, they will consider that the allegations of the bill have not been disproved. The rule on this point, with its qualifications, will appear by reference to the authorities. The general rule is, that an injunction is to be dissolved when an answer comes in and denies all the equity of the bill. This is the rule in ordinary cases; but, to use the words of Lord Eldon in Clapham v. White. 8 Ves. 36, there are "excepted cases;" such are, mismanagement of partnership concerns, cases of waste or destructive trespasses, patent cases, and cases of irreparable mischief. But even in those cases to which the general rule applies, the answer, to have the effect of dissolving the injunction or preventing its issue, must be specific and positive. 4 [2 Story, Eq. Pl. § 832 et seq.]

In Poor v. Carleton [supra], Judge Story says: "But supposing the doctrine (which he by no means admits) were as comprehensive as to the dissolving an injunction on the coming in of the answer as the counsel has contended for, the question occurs whether it is applicable to all kinds of answers which deny the whole merits of the bill, or whether it is applicable to such answers only as contain statements and denials by defendants connusant of the facts, and denying the allegations upon their own personal knowledge. It seems to me very clear. upon principle, that it applies to the latter only. The ground of the practice of dissolving an injunction upon a full denial, by the answer, of the material facts is, that in such a case the court gives entire credit to the answer. upon the common rule in equity that it is to prevail, if responsive to the bill, until it is overcome by the testimony of two witnesses, or of one and other stringent corroborative circumstances.

But it would certainly be an evasion of the principle of the rule, if we were to say that a mere naked denial, by a party who had no personal knowledge of any of the material facts, were to receive the same credit as if the denial were by a party possessing actual knowledge of them. In the latter case the conscience of the defendant is not at all sifted, and his denial must be founded upon his ignorance of the facts, and merely to put them in a train for contestation and due proof to be made by the other side." The learned judge proceeds: "What sort of evidence can that be, which consists in the mere negation of knowledge by the party appealed to? Such negation affords no presumption against the plaintiff's claims; but merely establishes that the defendant has no personal knowledge to aid it, or disprove it. It is upon this ground that it has been held, and in my judgment very properly held. that if the answer does not positively deny the material facts, or the denial is merely from information and belief, it furnishes no ground for an application to dissolve a special injunction." Poor v. Carleton [supra]. Judge Story has thus compendiously embodied the doctrine and the reason for its existence. His remarks were made on a motion for the dissolution of an injunction after answer. They apply to the present motion for an injunction after answer; for surely, if an answer does not so deny the material allegations of the bill as will authorize the dissolution of an injunction, such answer will not prevent the issue of one in a proper case.

In Clarke's Ex'rs v. Van Riemsdyk, 9 Cranch [13 U. S.] 160, the court say: "If a defendant asserts a fact (in his answer) which is not and cannot be within his own knowledge, the nature of his testimony cannot be changed by the positiveness of his assertion. The strength of his belief may have betrayed him into a mode of expression of which he was not fully apprised. When he intended to utter only a strong conviction of the existence of a particular fact, or what he deemed an infallible deduction from the facts which were known to him, he may assert that belief or that deduction in terms which convey the idea of his knowing the fact itself. Thus, when the executors say, that John Innes Clark never gave Benjamin Munro authority to take up money or to draw bills; when they assert that Riemsdyk, who was in Batavia, did not take this bill on the credit of the owners of the Patterson, but on the sole credit of Benjamin Munro, they assert facts which cannot be within their own knowledge. In the first instance, they speak from belief; in the last, they swear to a deduction which they make from the admitted fact that Munro could show no written authority. "These traits in the character of the testimony must be perceived by the court, and must be allowed their due weight, whether the evidence be given in the form of an answer or deposition. The respondents could found their assertions only on belief: they ought so to have

---

4 [From Hoff. Op. 234.]

expressed themselves; and their having, perhaps incautiously, used terms indicating a knowledge of what, in the nature of things, they could not know, cannot give to their answer more effect than it would have been entitled to had they been more circumspect in their language." A practical illustration of this doctrine, as applicable to an affidavit on a motion for injunction, is to be found in the case of Davis v. Leo, 6 Ves. 785, in which Lord Eldon says: "There is no positive affidavit in this case that the will was made, under which the plaintiff is next tenant for life, to the defendant Leo. This is a mere hypothetical title, upon the plaintiff's information and belief that a settlement was executed." It is to be borne in mind, that the grounds of defendant's information and belief were set forth and his belief sworn to. His lordship, however, proceeded and said: "There is no instance of an injunction in such a case. An affidavit to information and belief is nothing in this sort of case."

In Everly v. Rice, 3 Green. Ch. [4 N. J. Eq.] 553, the chancellor says, referring to the answer in that case: "In common charity it is to be presumed, that this general denial relates to a written agreement or deed which is not alleged in the bill, or else that it is predicated of the defendant's information and belief, which is not sufficient. The defendant must answer upon his own knowledge, and not upon information and belief, otherwise the injunction must be retained till the final hearing." Nor is this well-settled principle affected by the inability of a defendant to make a fuller denial; for the reasons given for the existence of it are unaffected by the inability of a defendant to make a fuller denial; and for the simple reason, that the existence of the fact alleged by complainant is unaffected by the ignorance of the defendant of its existence or the sincerity of his belief in its non-existence.

In Roberts v. Anderson, 2 Johns. Ch. 202, the bill prayed for an injunction staying all proceedings on a judgment in ejectment which had been obtained against the complainant. Chancellor Kent stated: "The only point is, whether the two deeds from Griffith to Sarah Johnson, under whom the defendants set up title, were fraudulent and void. The question of fraud was not tried; and from the history of the ejectment suit, as stated in the pleadings, it would seem that it could not be tried, as the recovery was placed entirely on the ground that the defendant at law was tenant to the new defendants, and so concluded from setting up this defense. But the fraud as charged, is a proper and familiar head of equity jurisdiction, and unless the answer be full and satisfactory, the injunction, if right in the first instance, ought to be retained until the hearing. All the denial contained in the answer is, that the defendants were not privy to any fraud, and were bona-fide purchasers, under a judgment and execution

against Sarah Johnson. If she had no title, they had none, and they aver that they believe her title was good, because they do not know or believe that the conveyances from Griffith to her were fraudulent. This is leaving the question of fraud as unsettled as before the answer came in. It is true, the defendants may have given all the denial in their power; but the fraud may exist notwithstanding, and consistently with their ignorance of the sincerity of their belief. In some particular cases, the court will continue an injunction though the defendant has fully answered the equity set up."

In the case of Everly v. Rice, the following is cited from the language of Chancellor Williamson, in the case of Kinnaman v. Henry: "I do not consider," said he, "the fraud in this case as sufficiently denied to entitle the defendants to a dissolution of the injunction upon the ground of the whole equity of the bill being denied. The defendants are not charged with being parties or privy to the fraud;" nor were they so. In relation to them the chancellor says: "All they could do, or which they have done, is to deny all knowledge or belief of the alleged fraud. The answer may be perfectly true, and yet Johnson, the mortgagor, guilty of the fraud imputed to him, and the complainant entitled to relief against these defendants. Such an answer is not sufficient denial of the complainant's equity to entitle the defendants to a dissolution of the injunction."

We will now submit to the principles enunciated in the foregoing authorities, the denials of the answer in this case. One allegation in the bill, and one of the most material, is direct and positive. It enumerates sundry documents constituting a part of the documentary title of defendants, and expressly charges, that all and singular said documents in relation to said Castillero's claim to said tract of land and cinnabar mine are false, fraudulent, ante-dated and forged, and they have all and singular been fraudulently contrived and fabricated since the right of property and possession to the said land and mine accrued to complainants, with intent to cheat and defraud the United States out of the property and possession of said land and mine. The denial of the defendants as to the forgery of the documents is to be found in section fourteenth of the answer. They say, that they have no personal knowledge of anything said or done by the said Castillero in or about his said representations to the Alcalde Pico, as shown in his letters, copies of which are exhibited in Exhibits A and B; neither have they any personal knowledge of what was said or done by the said alcalde, when he gave the said Castillero possession of the mine and lands around it, which was evidenced by the written instrument, a copy of which is exhibited, marked "Exhibit E;" nor have they any personal knowledge of what was said or done by Castillero, or the Mexican author-

ities, in and about the business which resulted in the proposals, contracts, grants, and official correspondence and reports which appear and are shown in the exhibits annexed to this answer, being Exhibits G, H, J, K, L, M, N; but they have been informed and believe that the said documents are perfectly genuine and fair, and express truly the matters and things to which they relate, and were made at the times of their respective dates.

Having stated their want of personal knowledge of the facts covered by said documents, in the fifteenth section of the answer, the defendants aver that, to the best of their knowledge, information, and belief, Castillero did present to said Alcalde Pico the two original letters, copies of which are hereto annexed, marked "Exhibits A and B," and that said letters were written on their respective dates; and said Pico did put the said Castillero in possession of the mine and of three thousand varas of land in all directions measured from the mouth of the said mine, in the month of December, 1845, and that all the matters of fact recited and described in the said instrument signed by Pico, alcalde, and by Antonio Suñol and José Noriega, attesting witnesses, a copy of which is shown in Exhibit E, are truly recited therein; and in the same section, the defendants Halleck and Barron say, and the defendants Parrott, Bolton, and Young, believe it to be true, that they (the said Halleck and Barron), have conversed with the said Pico, the alcalde, with the said Antonio Suñol, and with José Fernandez, who, in the month of December, 1845, was a clerk in the office of Pico, alcalde, who was present on the ground at the old mouth of the mine when the said possession was given, and also with other persons who lived in and about the pueblo of San José in 1845 and 1846, and who knew of the possession of said mine by Castillero as a matter of general notoriety; and from all the knowledge and information obtained from these and other various and authentic sources, which information was positive and precise, the defendants are convinced and believe that the possession of the mine, and of three thousand varas of land measured in all directions from the then mouth of the mine, was given by the said Alcalde Pico to the said Castillero, in the month of December, A. D. 1845, as set forth in Exhibit E. And this section concludes with the averment that to "the best of their knowledge, information, and belief," all the acts and things which are described and mentioned in the original documents, of which the Exhibits G, H, I, K, L, M, N, and O, are copies, did really take place, as they are therein set forth, and at the times therein specified, and that all the said documents are genuine, and were made at the times shown in their respective dates. In the sixteenth section of the answer, William E. Barron avers, and the defendants, Halleck, Young, Parrott, and Bolton, believe it to be true, that in the month of May, in the present year, he (the said William E. Barron), was informed by Segura, that he, Segura, was in 1846 president of the "Junta de Fomento," that his signature to the various "Exhibits," when shown to him, were genuine, and also declared that all the titles were signed by the persons who purport to sign them, and received by him; and a detailed statement by him is made of the facts connected with the acts of the said Segura in connection with the title of Castillero. In the seventeenth section of the answer a similar course is pursued, the difference being in the character of the facts communicated to Mr. Barron, and his informant on this occasion being Manuel Conto, secretary of "El Fondo de Mineria." In the eighteenth section of the answer a similar statement is made; the only difference being in the character of the facts narrated; being detailed by a different person, Jose Maria Duran, who stated he was chief clerk of the ministry of justice, under Becerra. In the nineteenth section of the answer, similar statements of facts are made upon the information of Castillo Lanzas, who was a Mexican official in 1846. In the twentieth section, the information was received by Mr. Barron from one Blas Balcarcel, who in 1846 was prefect of the National College of Mining in Mexico. In the twenty-first section of the answer, it is averred that Barron while he was in Mexico inquired in the various offices of the government, and found many persons who remembered when Castillero was in Mexico in 1846, and that it was reported and believed that he discovered a quicksilver mine in California, and that he was then engaged in making some contract with government in relation to the same; and from all the said Barron could learn, he is perfectly convinced that all the matters and things spoken of in the documents copies of which appear in the said Exhibits G, H, I, K, L, M, and N, are truly related in said documents, and that all the said documents are genuine and were made at the time they purport by their dates to have been made. In the twentieth section of the answer, all the defendants unite in the averment that they believe in the entire truth of all the information received as aforesaid by the said Barron, and from all said information, and from other sources of information, that all the matters and things spoken of in the documents copies of which appear in the said Exhibits G, H, I, K, L, M, and N, are truly related in said documents, and that all the said documents are genuine, and were made as they purport to have been made by their dates. The last section which alludes to that part of the bill which charges forgery and ante-dating, is the twenty-third; which denies generally the charges, and particularly denies that any of the documents copies of which are shown in the Exhibits A, B, E, G, H, I, K, L, M,

N, and O, are false, or fraudulent, or ante-dated, or forged, &c.

Most of that portion of the answer which responds to the allegations of forgery and ante-dating of the muniments of defendant's title, is given literally, and all substantially set out. It is matter elaborate and argumentative; but does not constitute positive and distinct denials, which the law requires in an answer in response to the material allegations in a bill, in order to influence the action of the court on a motion for an injunction in a case of irreparable mischief, or destructive trespass. The insertion in an answer of such denials merely, in the language of Judge Story, puts them in a train for contestation and proof by the other side. Poor v. Carleton.

The averment of the genuineness of the documents alleged by the bill to be forged and ante-dated, is founded entirely on "information and belief," and on deductions from facts of which defendants were informed. In the fourteenth section of the answer they say, they have no personal knowledge of anything said or done by Castillero in his representations to the Alcalde Pico, as shown in his letters; that they have no personal knowledge of what was said or done by the alcalde when he gave the possession of said mine to Castillero, evidenced by Exhibit E; nor any personal knowledge of what was said or done by Castillero or the Mexican authorities about the business which resulted in the documents, grants, &c., which are shown in the Exhibits G, H, I, K, L, M. N; but, they say, they have been informed and believe that said documents are perfectly genuine and express truly the matters and things to which they relate. The allegation in the bill is positive, and charges that these very documents, or rather their supposed originals, were fraudulent, forged, and ante-dated. The denial is, that the defendants have no personal knowledge of the facts exhibited in the documents, but they have been informed and they believe the documents to be perfectly genuine, express truly the matters and things which they relate, and that they were made at the times of their respective dates. Can such denial be deemed clear, direct, and positive? They do not pretend to have seen the originals; they disavow all personal knowledge of the facts to which they relate. Their belief as to the genuineness of the documents, is founded on the information they received that they were genuine; and upon the authenticity of that information they found their belief of the genuineness of the facts of which they relate, of which themselves are in no other way connusant. Every word they have uttered may be strictly true. Their belief may be sincere, they undoubtedly may have received such information, and yet the documents may have been fabricated as alleged, without imputation of false swearing. Hence the well-settled rule that the denial in an answer must be direct and founded on personal knowledge before the court can act upon them in a case of irreparable mischief, and the issue of an injunction to enjoin the same.

It is due to the defendants in this case to say, they have frankly disclosed the sources of their belief and sworn only to it. They have not placed themselves in the position of parties described by Chief Justice Marshall in Clarke's Ex'rs v. Van Reimsdyk, 9 Cranch [13 U. S.] 160. The strength of their belief has not betrayed them into a mode of expression of which they were not apprised. That when they intended to utter only a strong conviction of the existence of a particular fact, or what they deemed an infallible deduction from the facts known to them, they may assert that fact or that deduction in terms which convey the idea of their knowing the fact itself. In this case, the defendants tell us, they have no personal knowledge of the transactions; that they were informed the documents were genuine, and acting on that information, they swear to their belief of the existence of the facts to which they relate.

It may be urged, they could not truly make a fuller answer in the nature of things. This is true; and if the question was, whether such denials be sufficient to raise the issues for trial on the final hearing, and impose upon the complainants the duty of meeting them by proof, there could be no doubt that the pleading would be sufficient for that purpose. That defendants are unable to answer more fully, is not their fault; but the rights of complainants cannot be prejudiced, for it certainly is not their fault. The defendants are in the precise position of all other parties who are called on in a case like the present, to answer an alleged simulation of the title by those under whom they claim. Chancellor Kent only affirms the well-settled doctrine, when he says: "It is true, the defendants may have given all the denial in their power; but the fraud may exist notwithstanding, and consistently with their ignorance, or the sincerity of their belief." Roberts v. Anderson, 2 Johns. Ch. 202.

In ascertaining the sufficiency of the denials in the answer, it is necessary to refer to some other allegations in the bill. The twenty-eighth article of the bill charges that all the pretended proceedings before the said Alcalde Pico, in respect to the judicial possession of the mine, and all the pretended proceedings of the government of Mexico, were falsely and fraudulently made, contrived, procured, ante-dated and forged, in pursuance of the aforesaid fraudulent conspiracy against the United States, and with intent to defraud the United States out of said mine and minerals, or some part thereof, under false, forged, and ante-dated Mexican titles. The bill further charges that in pursuance of said conspiracy, letters were written and communications and memoran-

dums made between the said Alexander Forbes and his confederates, and the said J. Alexander Forbes, as their agent (copies of which are herewith filed as exhibits, marked "B, C, D" and "E," and made part of the bill), in and about the fabrication and procuring the aforesaid false, ante-dated and forged Mexican titles, &c. To these charges, they reply in the thirty-second section of the answer, and the defendants admit the correspondence embraced in said exhibits, to have been written by the parties to them, at the times they bear dates respectively, and at the places from which they purport to be written, except the letter dated 25th March, 1848, which they aver to have been forged. They do not deny that J. Alexander Forbes was acting in behalf of, or as agent of the parties, but they deny "that said letters and communications were written by the said parties with an intent to commit a fraud in furtherance of a conspiracy to fabricate a title, as charged in said bill, except so far as appears from said letters on the part of the said James Alexander Forbes." They neither deny nor admit such intention on his part; but refer to the correspondence for the ascertainment of the fact, whether or not a person under whom some of the defendants claim title, was guilty of the charges of conspiracy and intention to cheat, as alleged in the bill. Such denials of material allegations of the bill in the answer, though sufficient for the purpose of pleading, to place the issues raised in a train for contestation, are not sufficient to enable the court to act upon the documents as proved, and to refuse the injunction on that ground.

We have discussed this motion on the allegations of the bill and the denials of the answer, as all affidavits as to title have, in my opinion, been excluded by the well-settled rules of courts of equity, a rule affirmed by this court in the case of Tobin v. Walkinshaw [supra]. Judge Story has, as we have seen, expressed strong doubts of the propriety of the rule, and as an extended discussion has been made by the respective counsel in relation to title, it is deemed proper to look to the facts elicited by the affidavits, and to inquire into the allegations of forgery and ante-dating made against the documentary title set up by defendants, with a view not to decide upon or establish title, a matter within the exclusive jurisdiction of another tribunal, but to ascertain whether the facts and the testimony bearing upon the allegations of fraud, forgery, and ante-dating, be such as to satisfy the court that there is reasonable foundation for the plaintiff's title, which would entitle them to protection from irreparable mischief, in the event that such title should turn out to be well founded. My associate will give his views upon that point.

The remaining inquiry is, does the present case come within the range of cases in which courts of equity have exercised the powers now invoked? A response to this question will be found by reference to a few decided cases, in addition to authorities incidentally alluded to while commenting upon the objections urged by the solicitors for defendants. It is proper to observe, that the court on this motion is not to try title. The determination of that question belongs exclusively to another tribunal. All that we have to do in relation to title is to look to the allegations of the bill and the denials in the answer, and ascertain from them whether the plaintiff's title, in the language of Mr. Justice Story, "has such a probable foundation in the present stage of the cause, as to entitle the plaintiff to be protected against irreparable mischief, if upon the hearing it should turn out to be well founded." Poor v. Carleton. To this, the court will limit its remarks.

In Lloyd v. Passingham, 16 Ves. 59, a receiver and injunction were refused where defendant was in possession, but where the legal estate was charged to have been obtained through forged documents. The action of the court did not turn upon a want of power in the court, but upon the special circumstances of the case. The grounds on which the court decided will instruct us as to the principles on which a court of equity acts in cases analogous to the present. In that case, the defendants had recovered, by ejectment, certain estates. This occurred some fourteen years prior to the suit in equity. The latter was a bill filed to impeach the verdict in ejectment, principally as obtained upon forged entries of burial and death, contrived by Robert Passingham. The bill prayed for an injunction to enjoin the cutting of timber and other waste, and for a receiver. The case was argued on affidavits. Lord Eldon refused the application on three grounds: (1) Because the trial in ejectment had been had upon other testimony than the entries which were alleged to have been forged; (2) because doubts were thrown upon the affidavits charging the forgery, on account of contradictions as to time and circumstances, which made the act of forgery, if done, a remarkable one; and (3) because no danger as to the rents was suggested. His lordship looked to the additional circumstance, that the defendants would be made illegitimate, provided the testimony should bear out the affidavits.

It was under foregoing circumstances, where the defendants held the legal title and a judgment in ejectment obtained by them fourteen years previously, when the judgment had been obtained on other testimony beside the alleged forged documents, where the evidence as to the forgery was contradicted and where there was no irreparable mischief, for none such was suggested, that Lord Eldon refused the motion and concluded with these words: "Whatever may be the ultimate event of this suit to which my act this day, refusing this application, will be no prejudice, I do not consider that these circumstances form that extreme case in

which the possession is to be taken from those who have the legal title." 16 Ves. 72. Nothing is said of want of power in the court; a perfect legal title was in defendants, held under a judgment for fourteen years, accompanied by possession. The judgment was obtained on other testimony beside the documents alleged to be forged, the testimony as to forgery contradictory; and, above all, irreparable injury not even suggested; and yet his lordship in deciding against the motion bases his decision to a considerable extent on the last ground,— "that refusing the application will be of no prejudice." In his opinion the chancellor expressly says: "I give no opinion upon the application from injunction to stay waste." This language was used by him in view of the fact, that he did not view the case as one of irreparable mischief. This case not only establishes the power of the court, but no notice was taken of the fact that there was no suit at law pending at the time.

In the case of Lining v. Geddes, 1 McCord, Eq. 304, no suit at law was pending, and the court in its opinion was discussing the power of a court of equity to interfere by injunction in a case of trespass. They overruled the decision of the court below ordering an injunction to issue to restrain the defendant from obstructing a right of private way; and they at the same time place the doctrine on its true ground, that of irreparable injury. They consider a temporary obstruction of a private road, and similar trespasses, as not cognizable in equity. The decision in this case enunciates the true rule. It is the irreparable mischief which is to govern. A party may complain of what may be deemed technically a nuisance or waste; but the true question remains, is the act complained of one of irreparable mischief? The court in the above case say, that the nuisance complained of must be productive of irreparable injury. 1 McCord, Eq. 309. In reference to trespasses which are not attended by such mischief and an adequate remedy can be obtained at law, they say, such cases do not require the aid of a court of equity, and certainly not until the right has been determined at law. Id. Upon the nature and character of the injury complained of, depends to a considerable extent the jurisdiction of this court. Is it irreparable? Irreparable injury is such as cannot be estimated with accuracy in money, or where it is so great that the party committing it, cannot make a compensation, or where from its nature the injured party cannot be made whole. Such for instance, as the destruction of the substance of the thing. The property sought to be protected is mineral land, and a mine of great value. The acts which defendants are committing and intend to commit, are such as the law adjudges to be waste. This point is settled by the case of U. S. v. Gear, 3 How. [44 U. S.] 120, and also by the supreme court of this state.

In the case of Merced Min. Co. v. Fremont, 7 Cal. 321, it is said: "The ground upon which the injunction was granted in these cases of timber, coals, ores, and quarries was, that the trespasser, in the language of Lord Eldon, was 'taking away the very substance of the estate.'" "It must be conceded that the principles of these cases apply to gold mines as well as to others. In fact, there are circumstances connected with gold mines (and the remarks apply equally to quicksilver mines) that render the remedy by injunction more appropriate than to other mines. The only value of a gold-mining claim, in most cases, consists in the mineral. If a party removes the gold, he removes all that is of any value in the estate itself. It is emphatically taking away the entire substance of the estate." After affirming the rule, that facts to show that the injury is irreparable must be stated in the complaint, the court proceeds: "But in the cases of mines, timber, and quarries, the statement of the injury is sufficient. In the nature of the case, all the party could well state as matter of fact, is the destruction of the timber in the one case, and the taking away the minerals in the other. Taking away the minerals is itself the injury that is irreparable; because, it is the taking away the substance of the estate. The allegation of insolvency is not necessary to procure the injunction in these cases. The right to the remedy is based upon the nature of the injury, and not upon the incapacity of the party to respond in damages." In the opinion of this court, mere insolvency, if the amount is inconsiderable, would not give jurisdiction to a court; but where the amount is great, and the inability to respond is greatly disproportioned to that amount, such insolvency would be an element which would certainly influence the action of a court; and where it exists is a proper subject for an allegation in the bill.

Having disposed of the question relative to the power of the court, and the irreparable character of the injury complained of, we come to the consideration of another point: Have the complainants such a right in the premises as entitles them to an injunction to protect them until the litigation pending as to their title shall be determined? That the United States, by the treaty of Guadalupe Hidalgo, acquired the legal and paramount title, seems not to be denied. That no legal title can vest in defendants until the confirmation of their claim, under the act of March 3, 1851, is clear [Stoddard v. Chambers] 2 How. [43 U. S.] 316. But it is contended that the congress of the United States have dedicated the minerals in the lands of California to the public. The grounds on which this proposition is placed by defendants' solicitors are: (1) The United States by their general policy, and the direct concurrence of the executive branch of the government, have encouraged the working of

mines and the employment of mining capital in California. (2) The state has done the same by express legislation; and all the departments of the state government have concurred in establishing mining operations in the state on public land as the paramount interest of the state, to which all other industrial branches are subservient.

We shall not pause to inquire into the legislation of this state in relation to minerals on the public lands of the United States. One thing is certain, that neither her policy nor legislation, however much they may influence the action of the legislature of the Union, can deprive the United States of any legal right, or influence the action of this court in this case. That has been guarded against in the act of congress passed September 9, 1850 (9 Stat. 452), entitled "An act for the admission of the state of California into the Union." In that act it is expressly provided, "that the people of said state, through their legislature or otherwise, shall never interfere with the primary disposal of the public lands within its limits; and shall pass no law, and do no act, whereby the title of the United States to and right to dispose of the same, shall be impaired or questioned."

As to the ground that the congress of the United States have dedicated the minerals to the public, and hence there is no equity in this bill, it is difficult to perceive, if such dedication had been made, how it could affect in any way the equity of the present claim. Suppose it to be the fact, how can it affect the rights of defendants' private claim? If such dedication does authorize the occupancy of the public lands, and permit persons who occupy them to dig the minerals in conformity with state laws, can the acquiescence of the general government in their so doing, aid legally or equitably the title of defendants, who do not claim under that permission, but claim to have an adverse and exclusive right to the property as against the United States and all the world?

The claim of these defendants of the exclusive ownership of the mine, is inconsistent with the title they attempt to set up, under the dedication by congress of the minerals to the public. They cannot in the same breath set up a superior adverse title, and also a right to work the mine by reason of a dedication of the minerals to the public. Congress has never parted with the right (reserved as we have seen by the act admitting this state into the Union) of disposing of the public mineral lands. They have merely exempted them from the general land laws, and have omitted to legislate in regard to them except to exempt them from pre-emption rights, by the act of March 3, 1853. They can at any moment dispose of them. The defendants did not enter upon the premises by virtue of any tacit or implied permission and license, but adversely as owners, and claim the lands as theirs, whatever disposition the United States may make with regard to the public mineral lands. If relying upon such permission to all persons to enter upon, and work mineral lands, defendants had entered, it might be a sufficient answer to a bill for an account of profits during the time such permission continued. But defendants did not enter, nor do they claim under such license, but adversely as owners. The United States having the title to the mine, the court cannot say that they have lost their rights, because, with regard to other minerals they have not asserted them.

Congress, to whom alone under the constitution of the United States, regulations for the disposal of public property is confided, have, so far as their action goes, manifested their determination to relinquish no right to any public land in California. Having protected in the act admitting the state into the Union, their title to the public lands so far as the state was concerned, they proceeded to guard that title from individual claimants. The treaty of Guadalupe Hidalgo addressed itself to the political department; and up to the passing of the act of March 3, 1851, that department alone had power to perfect titles and administer equities to claimants. [Glenn v. U. S.] 13 How. [54 U. S.] 260. Congress in the fulfillment of its treaty obligations, passed that act entitled "An act to ascertain and settle the private land-claims in the state of California." It is an established principle of jurisprudence in all civilized nations, that the sovereign cannot be sued in its own courts, or in any other without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another state. And as this permission is altogether voluntary, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it. Beers v. Arkansas, 20 How. [61 U. S.] 527. Under this power, the political department transferred, by the act of March 3, 1851, the power of perfecting titles and administering equities to individual claimants. Aware that many claims would be made under Mexican titles, some legal, others equitable and inchoate, and others fraudulent, and with a view to segregate all lands of individual claimants from the public domain, congress passed the act in question. Desirous to fulfill in a liberal spirit the treaty obligations of the government, they imparted to the tribunals to which the jurisdiction was committed, rules of decision different from those which obtained in the ordinary judicial tribunals of the country. This extended range of principles was made their rule of action, to effect what congress purposed they should; that is, to enable them to confirm a large number of

claims which were inchoate and, being no evidence of legal title, presented inchoate and equitable rights, commending themselves to courts regulated as those tribunals were by the "principles of equity which could not be enforced by the ordinary judicial tribunals."

We consider it evident that the United States have a title and interest in the premises in dispute, and have a clear right in a proper case to invoke the interposition of a court of equity to protect the property until the title to it is ascertained in the manner prescribed by law—whether it be public land or not. One of the terms on which the United States consented to be sued, is prescribed in the 13th section of the act; which enacts that all lands the claims to which have been finally rejected by the commissioners, or which shall be decided to be invalid by the district or supreme court, shall be deemed, held, and considered as part of the public domain of the United States. Dunl. Laws U. S. 1296.

The fact is admitted by the pleadings in this case, that a petition is pending in behalf of defendants, in the name of one Andres Castillero, in the district court, on appeal from the commissioners, having for its object a confirmation of the title to these premises. The result of a decision in one way will be to segregate the premises from the public domain; and they will not be segregated until such decision is made. A contrary decision will leave the property in the hands of complainants. Can it be successfully asserted that the United States have no such interest in the mine as will authorize a court of equity to protect the property while that issue is pending? We consider the legal title to this property to be in the United States, until it is decided to be private property. But suppose it be assumed that the interest held by the United States is to be confined to what they hold under the act of March 3, 1851. If such assumption be made, it may be contended that, so limited, it is a mere contingent interest, and not to be protected by the court,—that it is not a vested interest. The answer to such suggestion is, that the right or interest of defendants is equally contingent; and again, that the right of complainants, if it be admitted to be contingent, will not deprive it of protection from a court of equity in a proper case.

The court will grant an injunction when the aggrieved party has only equitable rights. Thus in cases of mortgages, if the mortgagee or mortgagor in possession commits waste, or threatens to commit it, an injunction will be granted. So where there is a contingent estate on an executory devise dependent over upon a legal estate, courts of equity will not permit waste to be done to the injury of the estate. In case of a mortgagee filing a bill to stay waste by the mortgagor in possession, the court will interpose, although the right of the mortgagee in the land or its proceeds is contingent upon his recovery of the debt, to secure payment of which the mortgage was given. In Camp v. Bates, 11 Conn. 51, a bill was filed to enjoin waste upon property on which complainant held a lien as an attaching creditor, under a law of the state. It was admitted that by the attachment the party acquired no legal title to the property, and that he might never obtain one. The court say: It has been urged that the "plaintiff had neither an equitable nor a legal title. That he had no interest in the estate, none which a court of equity would consider a vested interest:" and the court proceeds to inquire into the right of the party, and coming to the conclusion that the attachment, when completed, would bind the estate under the provisions of the law, say: "We are not, then, to speculate as to the result whether the creditor will recover at all, or recover the full sum he demands. The estate attached is to be held subject to meet that recovery, be it more or less. The question then arises, does the law give this privilege and then leave the debtor to take it away or destroy it? Does the law give a privilege and allow the party against whom it is given to render it useless? Is a court so utterly impotent, or is it so fettered by its own rules, that this may be done and the court have no power to prevent it? Did not the plaintiff, by his levy, acquire the sanction of the law that the property should stand pledged to await his judgment? Had he not, then, a right acquired by this lien, a right which a court of justice is bound to respect and defend? It is not indeed a legal interest, which would pass by a release deed; but it is a right not less sacred, and no less regarded by a court of law." The fact, then, that the interest of the complainants under the act of congress of March 3, 1851, is made contingent, does not defeat their right to the protection of the court. We have referred to this last case, to show that the submission by the United States of their title to a contingency does not affect injuriously the present application.

The bill in this case prays for an injunction to stay future waste, and also that the action of the court may extend to the preservation of the ore and materials now upon said mine and land, and all the quicksilver extracted from the ore of said mine in the possession of said defendants. It is urged that injunction is not granted in restraint of the removal of that which has been disconnected from the realty and assumed the shape of chattels. In the case of Watson v. Hunter, 5 Johns. Ch. 169, the principle affirmed is that in ordinary cases where no special circumstances intervene, injunction will not be issued to prevent the removal of timber already cut. Chancellor Kent concludes his opinion by saying: "I do not mean to be understood to say that the court will never interfere, but that it ought not to be done in ordinary cases like the present." In Winship v. Pitts, 3 Paige, 259, 261, it is said: "In ordinary cases, the account for waste already committed is merely incidental to the relief by injunction

against future waste, and is directed to prevent a multiplicity of suits. The rule, however is general, that although the recovery of damages for waste is not a substantial ground for a bill in equity, yet if the court has jurisdiction of the subject upon any other ground, it will decree an account of the waste committed." 1 White & T. Lead. Cas. Eq. 554. In Backler v. Farrow, 2 Hill (S. C.) 111, the court asserts the general rule to be, that damages for waste cannot be recovered, the remedy being at law; but they say: "But, having proper jurisdiction of the case, there is hardly any question in relation to property which this court may not determine incidentally, for the purpose of doing complete justice and preventing multiplicity of litigation." The rule as laid down in the case of Jesus College v. Bloom, 3 Atk. 262, Amb. 54, is that a bill will not lie for waste merely, but if the party be properly in court for another purpose, as to obtain an injunction, then an account of past waste will be granted. "There are many cases where this court have made decrees in the cases of mines which they could not have done in the cases of timber. There is no question that the court was in possession of this case, and incident to it were the accounts for rents and profits and the account for waste."

Where an injunction against waste is granted, if the complainant has a claim in law to satisfy for the value of the timber or other matters, the removal of which constitutes the waste, he is entitled to an account as of course, as incident to the injunction and to prevent multiplicity of suits. 1 White & T. Lead. Cas. Eq. 554. Now, the removal of large amounts of minerals constitutes waste. The result of the doctrine furnished by the authorities is, that in an ordinary case an injunction will not be issued to operate upon past waste; but that in cases where the court has original jurisdiction of the case, and the party is properly in court for some other purpose, for instance, to obtain an injunction, or where there is the allegation of fraud, or where the removal constitutes a part of the waste, the court may extend its protection to past waste. That the cases which constitute exceptions to the rule which applies to ordinary cases are those where the profits of mines and the opening of mines is the waste complained of.

To this point is the case of Jesus College v. Bloom, Amb. 56, where the court, referring to an authority cited, say: "The more probable reason for decreeing an account in that case seems to be because it was the case of mines; and the court always distinguishes between digging of mines and cutting of timber, because the digging of mines is a sort of trade; and there are many cases where this court will relieve and decree an account of ore taken when in any other tort or wrong done it has refused relief." We consider this case not to be the ordinary one of cutting timber, but the working of a valuable mine,

and that the injunction in this case should extend to ore extracted, and remaining on the premises as well as to future waste.

A careful examination of this case has brought the court to the following conclusions: That the complainants have exhibited a title to the premises in dispute, which entitles them to an injunction to stay waste upon it; that the character of the waste complained of is what the law deems irreparable mischief; that the allegations of the bill charging forgery, fraud, and ante-dating upon the documentary title under which defendants claim, have only been denied "on information and belief," which will not authorize the court to consider the allegations in the bill on this motion as disproved; and lastly, that the facts as shown by the exhibits annexed to the pleadings, and the affidavits filed, if they are to be considered, do not set forth circumstances showing good faith, which, according to Mr. Justice Woodbury, in Perry v. Parker [Case No. 11,010], must accompany "a general denial" of plaintiff's title, in order to make it sufficient. The court, therefore, are constrained by a "judicial necessity," to grant the injunction prayed for. The injunction will be temporary, subject to the further order of the court. It is not to be anticipated that either party will interpose any obstacle to the prompt determination of the issue as to the title to the premises now pending. But it is deemed proper to keep this injunction under the control of the court, so that it may be able to do what subsequent events may require.

The bill prays that a proper person or persons may be appointed receivers of the said tract of land, mine, and minerals, take possession of the same, with the appurtenances, receive the profits of same, and all the ore of said mine, and the quicksilver extracted therefrom, and to lease, work and manage the said mine, and receive the rents, issues and profits thereof, and the ore and quicksilver to said mine or elsewhere, in the defendant's possession, that has been extracted from said ore; to make sale and disposition thereof, to be accounted for under the order of this court. The court do not consider that the appointment of receivers with such extreme powers, is at this time necessary. The ground on which the court has felt it to be its duty to interpose by injunction in this case, is to preserve the premises from waste and destruction, while the title to it is undecided. It has also considered it its duty to enjoin against the removal of the ores which have been already extracted, and remain on the premises. Every object contemplated by the bill, and which the court desires to effect, would seem to be attained by enjoining the further working of the mine, and the reduction and carrying off the ores now on the premises. Unless those ores are liable to deterioration, from natural causes or by being plundered, there is no necessity to appoint a receiver. If, however, it be made to appear

that the condition of those ores is from any cause insecure, or other circumstances which may call for further interposition, the court will take into consideration an application for the appointment of a receiver.

An injunction, in accordance with the prayer of the bill, and in conformity with the views herein expressed, will be submitted, by the solicitors for complainants, to the court.

HOFFMAN, District Judge. In the opinion just read, this case has been considered on the allegations of the bill and answer alone, excluding all affidavits on either side relating to title. It has been seen, however, that in the opinion of Judge Story, the court to prevent irreparable mischief may look to "affidavits in affirmance of the plaintiff's title, not so much with a view to establish that title, but to see whether it has such a probable foundation in the present state, as to entitle the plaintiff to be protected against irreparable mischief, if upon the hearing of the cause it should turn out to be well founded." Poor v. Carleton [Case No. 11,272]. Had no answer been filed, it is clear that the court, as in the case of Lloyd v. Passingham, 16 Ves. 59, and in that of Perry v. Parker [supra], relied on by the defendants, might have heard the motion on affidavits filed on both sides. Unwilling to rest the decision of the motion upon what may seem a technical and rigorous rule, and on allegations in the bill which are assumed to be true merely because not met by a positive denial in the answer, we have looked into the affidavits on either side with a view of ascertaining whether the complainants, assuming such an inquiry to be admissible, have made out such a prima facie or probable case, as will warrant the interference of the court in this preliminary stage of the cause. That the court will interfere to prevent the destruction of the estate or fund, even though the title is disputed, has already been abundantly shown. That it will so interfere against a party in possession, and even against such a party having the legal estate, is also clear. The inquiry arises, what must be the nature or force of the evidence which the court will exact before it exercises this authority? It is admitted in the case of Perry v. Parker that a mere denial of plaintiff's title, without any evidence to show the denial to be made probably in good faith, and to be sustained by something of fact and law, is not sufficient. In Daniell, Ch. Prac. p. 2027, it is said: "The court will appoint a receiver against a party having possession under a legal title, if it can be satisfied that such party is wrongfully entitled to such legal estate." Where the right to the possession is in dispute, the court will, if it sees clearly that the plaintiff has the right, and that the ultimate decree will be in his favor, appoint a receiver, pending the suit. Id. p. 2026.

It might be inferred from these authorities that the court will in no case interfere against a party in possession, unless on evidence sufficient to satisfy it that he has no title. Such, however, we do not conceive to be law. The extracts from Daniell's Practice, above cited, refer to cases where the property is in possession of a party having the legal estate. In such cases much reluctance is undoubtedly felt by courts of equity to interfere by injunction. But even in such cases, the case of Lloyd v. Passingham impliedly sanctions the doctrine that where there is danger to the substance of the inheritance, and the damage apprehended is great and irreparable, the court will not confine its interposition to those cases alone, where it can declare itself satisfied that the defendant has no title. In the case of Perry v. Parker it does not appear that any irreparable injury was apprehended; and even in that case the court enters into an elaborate examination of the titles of plaintiff and defendant with an evident inclination to the opinion that the former is more than doubtful. Daniell, on the page succeeding that on which the last citation is found, states that though the court will not interfere on the mere ground of title, it will appoint a receiver at the instance of parties beneficially interested, even where there is no fraud or spoliation, provided it can be satisfactorily established that there is danger to the estate or fund, unless such a step is taken. In the case of Poor v. Carleton [Case No. 11,272], Judge Story says: "The true rule seems to me to be that the question of dissolution of a special injunction, is one which after the answer (denying the whole merits of the bill) comes in, is addressed to the sound discretion of the court. In ordinary cases the dissolution ought to be ordered because the plaintiff has prima facie repelled the whole merits of the claim asserted in the bill. But extraordinary circumstances may exist, which will not only justify but demand the continuation of the special injunction. This, upon the principles of a court of equity, which will always act to prevent irreparable mischiefs and general inconvenience in the administration of justice, ought to be the practical doctrine; and I am not satisfied that the authorities properly considered establish a contrary doctrine." And this, says Judge Story, seems to have been the course which commended itself to the mind of that great equity judge, Chancellor Kent. Poor v. Carleton [supra].

We think that the opinion of Judge Story above cited, is sufficient authority for the position that in cases, like the present, of irreparable mischief, the court in examining the affidavits, assuming them to be admissible, will inquire whether the title of the plaintiff has such a probable foundation as to entitle him to be protected during the litigation by which it will finally be determined. And that in cases of threatened waste and destruction of the estate, where the apprehended injury is great and irreparable, as also in cases of the threatened destruction of heir-looms, works of art, &c., the court, in the exercise of a sound discre-

tion, should interfere even in doubtful cases to preserve the parties in statu quo until the right can be determined. We will therefore examine to some extent the evidence which has been adduced on either side, and which has been so largely discussed at the bar, in order to see whether the complainant's title appears to have such a probable foundation, and the allegations of the bill are sustained by such proof, as to warrant the court in interposing to protect the estate until the determination of the right.

The title set up by the defendants consists of an alleged mining right or title, originally acquired by denouncement and registry under the mining laws of Mexico; and secondly, an alleged concession of two sitios de ganado mayer, made by the supreme government of Mexico. The evidence of the mining right or title is in the form of an expediente or record, consisting of two letters of Andres Castillero, addressed to Antonio Maria Pico, alcalde, and an act of possession purporting to be executed by that officer, in which he recites that he has given possession of the mine and of three thousand varas of land in every direction, to Castillero. The evidence of the two-league grant consists of a dispatch from Castillo Lanzas, minister of exterior relations of Mexico, addressed to the governor of California, but produced by the defendants. In this dispatch a communication to Lanzas from the minister of justice, is set forth. In that communication the minister of justice transcribes a communication addressed by himself to Segura, president of the junta for the encouragement of mining. In this last communication, the minister of justice informs Segura, that the president has been pleased to approve the agreement made with Castillero, to commence the exploration of the mine, and that the corresponding communication is made to the ministry of exterior relations, that it may issue the proper orders relative to what is contained in the 8th proposition with respect to the granting of lands in that department. The minister of relations, after reciting the above letter, adds: "And I have the honor to inclose it to your excellency (Lanzas) to the end that with respect to the petition of Senor Castillero, to which his excellency the president ad interim, has thought proper to accede, that as a colonist, there be granted to him two square leagues upon the land of his mining possession, your excellency (viz. Lanzas) will be pleased to issue the orders corresponding." Castillo Lanzas thereupon adds: "Wherefore I transcribe it to your excellency (viz. the governor of California), that in conformity with what is prescribed by the laws and dispositions upon colonization, you may put Senor Castillero in possession of the two square leagues which are mentioned. God and Liberty. Mexico, May 23, 1846. Castillo Lanzas. To His Excellency, the Governor of the Department of Californias." It is not pretended that this dispatch was ever delivered to, much less acted on by, the governor of California. On its face it purports to be merely one official communication reciting another, in which it is stated that the president has thought proper to accede to an application for a grant, and that fact is communicated to the governor in order that he, in conformity with the laws of colonization, may put the applicant in possession. Whether a dispatch of this kind, addressed by one Mexican functionary to another, never acted on by the latter, and which in all probability could not have reached him until after the subversion of Mexican authority in this country, and after the rights of the United States by conquest had accrued could convey any title either legal or equitable to a person who, during the existence of the Mexican authority, did no act whatever on the faith of it, it is not necessary now to decide. It is at least clear, that it is not a formal grant. It is at most, evidence that the president had acceded to a petition for two leagues of land. It is not addressed to the petitioner, nor intended as a muniment of title to him. It is but an order to the governor to make him a title and put him in possession. Whatever title, therefore, the defendants may claim under this official letter, it is evident that it can be at most but equitable and inchoate. And that, as the two leagues were never measured off to the applicant, nor was he put in possession by Mexican authority, the legal title and right of possession to the land vested by the conquest in the United States.

It was not contended at the hearing that any measurement was made or possession given of any specific tract of land by metes and bounds, or that the three thousand varas in every direction, mentioned in the act of possession, were marked upon the ground. It is also clear, that the mining judge, under the ordinances, had no right to give possession of a tract so extensive. It is claimed, however, that this act of possession was ratified and confirmed by the supreme government. No formal act of ratification is produced, or alleged to have been made. The evidence of the ratification is to be found, if at all, in the letter of Lanzas, already cited, and in the communications which it recites, and copies of which are produced, taken, it is alleged, from the Mexican archives. As Castillero, in his proposals to the mining junta, had asked that body to recommend the ratification of his mining possession, and as the communication from the minister of justice states that the president has been pleased to approve in all its parts the agreement made with Castillero, it is urged that that letter is evidence of such ratification. Whether or not it should so be considered, it belongs to another tribunal to decide. It is not claim-

ed. however, that any possession by metes and bounds of this 3.000-vara tract was taken. nor was any survey or measurement effected until long after the conquest of the country, and after the rights of the United States had accrued. It is evident, therefore, that the defendants can claim no legal estate or prior adverse possession. either in the two-league tract which they have surveyed, and now occupy, or in the 3,000-vara tract, mentioned in the alcalde's act of possession. But all these documents are in the bill charged to be fraudulent, and antedated.

The evidence chiefly relied on in support of this allegation, is contained in a correspondence attached as an exhibit to the bill. The genuineness of all of these letters, except one, is admitted. The answer denies "that the said letters and communications were written by the said parties with intent to commit a fraud, or in furtherance of a conspiracy to fabricate a title, as charged in said bill, except so far as the said intention appears from said letters on the part of the said James Alexander Forbes." Section 32. Two of the defendants claim under James Alexander Forbes. As to him, the conspiracy to fabricate a title "so far as appears from said letters," is admitted. An examination of the letters will. however, convince us, that whatever fraudulent designs were entertained by James Alexander Forbes, were equally entertained by the parties whose agent he was, and with whom he was in correspondence, and that the somewhat anomalous case is not presented of a conspiracy by one person. The original act of possession, or registry of the mine, was obtained, as alleged by defendants, by Castillero for the benefit of himself and his socios or partners. On the 12th June, 1846, Jose Castro, in pursuance of powers given to him, as he recites, by his other partners, executed a power of attorney to one McNamara. authorizing him to enter into a contract for the three pertenencias of the mine with an English company "with exclusion of any other nation." This power of attorney, if its date be genuine. must have been executed on the occasion of McNamara's visit to California in May, 1846, as mentioned in Alexander Forbes' letter of May 11, 1846. He seems not to have immediately acted on it. for a letter is produced from him, dated at Honolulu on the 27th September. of the same year. As the alleged dispatch of Castillo Lanzas was written in Mexico on the 23d May, 1846. it is evident that at the time of executing this power of attorney. the only evidence of title to the mine which Castro could have possessed. or the existence of which he could have known, was the act of the alcalde. in which possession is given of three thousand varas in every direction from the mine. The power of attorney. however, exclusively refers to three pertenencias of the mine. In pursuance of this power of attorney, McNamara, on the 28th day of November, 1846, at Tepic, entered into a contract with Alexander Forbes for the working of the mine. It is, we think, evident from the letter of Alexander Forbes, of January 7, 1840, that Castillero was present at this negotiation. In that letter, Forbes says: "I had the pleasure to receive your very obliging letter of the 29th October last (1846), which chiefly relates to the mine of quicksilver about which I wrote you at so much length by Mr. McNamara. I had, previously to the receipt of your letter, been in treaty with D. Andres Castillero, and on the arrival of Mr. McNamara with powers from the other proprietors, the treaty was much facilitated; and I am now happy to inform you that I have contracted for the habilitacion of the mine, and have purchased a portion of Mr. Castillero's barras, all of which will be made known to you by Mr. Walkinshaw, who goes to California as my agent and attorney for the examination and working of the mine." If, then, as would seem to be the case. Castillero was present when the contract between Forbes and McNamara was entered into, it is strange that he did not himself become a party to it; and it is still more strange that the contract refers exclusively to the working of "the three pertenencias embraced in said quicksilver mine," and makes no allusion whatever to the two-sitios tract which Castillero must at that time have obtained. The instrument by which Castillero ratified this contract, and also that by which he sold a portion of his barras, are dated in Mexico on the 17th December, 1846. In the deed of ratification, for the first time allusion is made to the two square leagues conceded to Castillero, and a copy of the Lanzas dispatch is annexed to it. No reference is. however, made to the mining possession of three thousand varas in every direction, nor to any alleged confirmation of it. but the contract of McNamara for working the three pertenencias of the mine is alone referred to.

In the letter of James Alexander Forbes, in reply to that of Alexander Forbes, of January 7. 1847, and to another of the 27th January. which is not produced. he says: "It is of the most vital importance to obtain from the government of Mexico a positive, formal. and unconditional grant of the two sitios of land conceded to D. Andres Castillero, according to the decree appended to the contract, and also an unqualified ratification of the judicial possession which was given of the mine by the local authorities; including. if possible. the three thousand varas of land given in that possession as a gratification to the discoverer. These documents should be made out in the name of Don Andres Castillero." He then expresses the opinion that it will not be difficult to obtain these documents from the supreme government, and adds that they should be

of the date of the decree of Señor Lanzas. This letter is relied on by the defendants, as showing that at that time the decree of Lanzas, as now produced, was in existence. It must be admitted that the reference to a dispatch of Lanzas, ordering a possession of two sitios to be given, is clear. Whether that dispatch is in all respects the same as that now exhibited, does not so certainly appear. But it is equally clear that the recommendation to procure other documents, the dates of which were to be false, is unequivocally and explicitly made. No letter is produced from Alexander Forbes, which discloses the manner in which this proposition was received; but in October of the same year, we find that the latter has come to California, and is actively engaged in exploring the mine. His proceedings while here will hereafter be referred to. Mr. Alexander Forbes seems to have remained in California until the end of March, 1848. In April of the same year, he appears to have sold his interest in the contract to various habilitadores, among whom, Jecker, Torre & Co. and the house of Barron, Forbes & Co., of Tepic, were chiefly interested. The first letter from these parties is dated on the 20th May, 1849, and is addressed to James Alexander Forbes. It commences as follows: "From certain circumstances you have communicated to us, it may be necessary to purchase some lands in the vicinity of the mine of New Almaden." It then empowers James Alexander Forbes to make such purchase at a sum not exceeding $5,000. On the 27th May, 1849, a memorandum was left with Alexander Forbes, at Tepic, by James Alexander Forbes, "of the documents which Castillero will have to produce in Mexico." The documents required were as follows: (1) A full approbation and ratification of all the acts of the alcalde. (2) An absolute and unconditional title for two leagues of land to Andres Castillero, with boundaries which are mentioned. (3) The dates to be arranged by Don Andres, and to be certified by the American minister. We will hereafter see that this memorandum is alluded to, and its contents repeated, in subsequent letters between the parties.

On the 28th October, 1849, James Alexander Forbes, in a letter to William Forbes, again alludes to the insecurity of the title on which the mine was held. After stating his apprehensions of the destruction of some important papers of the original registry of the mine; or, that a question might arise as to their legality; and, after adverting to the fact, "that no posterior grant of the government could authorize the occupation of the land of the Berreyesas, on which the mine is declared to be situated, in the original expediente of registry," he adds: "In view of these facts, it behoves you to obtain from the supreme government of Mexico, the full and positive grant of the two sitios of land upon the land of New Almaden, under date of the order to Castillo Lanzas, bearing in mind that this document must express the entire approbation of the supreme government of all the concessions made by the local authorities or alcalde of the district of San José, of the original grant or registration of the mine." He then proceeds to give the boundaries which should be mentioned in the concession. They are the same as those given in the memorandum above referred to. In the succeeding letter which, perhaps erroneously, has the same date as the last, James Alexander Forbes again calls the attention of William Forbes to the importance of his suggestions relative to the "perfecting of the title to the mine," and adds: "Without now entering into particulars, already explained to yourself and Mr. Alexander Forbes verbally, I desire only to impress upon your mind the vast importance of securing from the supreme government of Mexico the documents comprised in the memorandum left with Mr. Alexander Forbes when I was in Tepic, for Castillero." On the 30th October, 1849, he again recurs to the subject. In his letter of that date, he says: "You will now readily perceive the great importance of my advice to purchase a part both of the lands of Cook and of the Berreyesas. You were of opinion that this measure would not be necessary, in view of the supposed facility of getting the title to the mine perfected in Mexico. It is now more than five months since it was decided that Castillero should procure the necessary documents in that city, and that they should be sent as soon as possible. On the one hand, I depend on the precarious and illegal possession of the mine granted by the alcalde to Castillero, who was in reality the judge of the quantity of land given by the alcalde. On the other side, I am attacked by the purchasers of the same land declared by Castillero himself to comprise the mine." He concludes as follows: "I do entreat you to use every effort to send me the document of the ratification of the mine, and the grant thereon, at the very earliest opportunity—properly authenticated and certified, as explained by me when I was in Tepic." On the 30th November, 1849, Barron, Forbes & Co., reply to the communications of Jas. Alex. Forbes. As this is the first letter in which his suggestions are noticed by the parties with whom he was corresponding, it is important to see how they were received, and how far the allegation of the answer that the design of fabricating a title existed on the part of James Alex. Forbes alone, is sustained.

After acknowledging the receipt of letters and communications from Jas. Alex. Forbes, by the steamers "California" and "Panama," Barron, Forbes & Co. say: "We are glad that you have not been obliged to purchase Berreyesa's land. This is certainly a most important point, and we trust that the document sent will be of great consequence in that respect. But you will of course take care that no risk is run, and you will do

in this affair as your best judgment shall direct you, keeping in view that at all hazards, and whatever cost, the property of the mine must be secured. Castillero, we expect, will soon be here, from Lower California, and if anything can be done in Mexico, he is the fittest person to procure what may be wanted." On the 1st December, 1849, Alexander Forbes writes to James Alex. Forbes, as follows: "The document sent up to you by the last steamer, for the grant of lands to D. Andres Castillero, was by mistake, not the one meant to be sent. I find now that the proper one was registered by me in Monterey, and the original deposited there. The one sent you was directed at foot to the governor of California, and the one deposited at Monterey was directed to Don Andres Castillero. The difference is, that by one the delivery by the governor was perhaps necessary to make the grant valid, whereas the other, being addressed directly to Don Andres, did not require that formality, nor was any other proceeding necessary, thus making it a better document than the greater part of the other titles for lands in California." He then proceeds to advise James Alex. Forbes to apply for a copy of the Monterey document, and to withdraw the one sent, and substitute the other. After reminding him of "another difficulty," viz. that the instrument made in the city of Mexico contains an exact copy of the document sent to him, and addressed to the governor, he concludes by leaving the whole subject to the discretion of his correspondent.

It is apparent from this letter, the genuineness of which is admitted, that two documents were then in existence, purporting to be concessions of land to Castillero. One addressed to the governor, which is that now produced, and one addressed to Castillero, which has disappeared. None such has been found at Monterey, where Alexander Forbes himself states he deposited it; nor do the defendants now claim that any such document was ever issued. If, as Forbes states, such a document was deposited in Monterey, it must have been fabricated. For the theory of this case on the part of the defendants is, that the dispatch to Lanzas, addressed to the governor, constitutes their only title for the two-sitios grant. On the 20th December, 1849, Jas. Alexander Forbes, in a letter to Barron, Forbes & Co., acknowledges the receipt of a certified copy of the grant of the two sitios to Castillero, and states at length his opinion that it is insufficient. He again urgently recommends that "Castillero, or some other fit person, should obtain from the supreme government of Mexico, a positive, explicit, and unconditional grant of the two sitios of land. In this document particular reference must be made to the concession of the mine by the alcalde of San Jose, approving of said concession, and conceding to Castillero and his associates in place of the three thousand varas, the said

two sitios of land, citing dates, and making that of the said document to correspond with the imperfect and ambiguous document of which you have sent me the copy." At the close of this letter he adds: "I pray you not to be deluded into the belief that there will be no necessity for obtaining the·document herein described." On the 29th January, 1850, James Alexander Forbes acknowledges to Alexander Forbes, the receipt of a copy of the contract of habilitacion, and adds: "As you request me to address myself to B., F. & Co. (Barron, Forbes & Co.) on the affair of the mine, I have now written upon this particular subject, to which I request their earnest attention, not as regards the habilitation, but another document which you know of." On the 3d February, 1850, Alexander Forbes writes to James Alexander Forbes as follows: "I have every reason to believe that the documents you mentioned will be found in the city of Mexico; and as Mr. Castillero will return there, they will no doubt be procured; but we are at some loss to know what is exactly wanted, and I beg you will by the next steamer give a sketch of the documents to which you allude, particularly a description of the limits of the grant. I think you must not have received the information sent you of the existence of the grant of the two sitios directly to Castillero and registered in Monterey; nor am I sure if that will mend the matter." After alluding to a last resort which he mentions "with great repugnance," viz. "the promotion of the invalidation of the title of the Berreyesas to their rancho, and adding that "if no opposition or disclosures are made, they may be left in possession," he proceeds as follows: "We think at present that it may be the best plan to get an authenticated copy of the approval of the Mexican government of the grant of 3,000 varas given by the alcalde. Castillero says such approval was given, and that on his arrival he will procure a judicial copy of it. This is the plan we shall adopt, if we hear nothing from you to alter this resolution. Since writing the foregoing, I have looked over your private letter to William Forbes, dated October 18th, and find you state the limits or boundaries as follows." Mr. Forbes then states the boundaries, and adds: "Castillero is not certain of accomplishing this latter plan, and thinks the first, that is, the three thousand varas, the best." And on the 6th February, 1850, Barron, Forbes & Co. write to Jas. Alex. Forbes, informing him that "they had hoped that the document lately sent for this grant to Castillero, would have been sufficient; but as you seem doubtful on this point, we have spoken to him, and his opinion is, that if this grant is not tenable, it will be better to go upon the three thousand varas of the alcalde, granted at the time of giving possession of the mine, and approved of by the Mexican government, which approval will be taken from

the Mexican archives and sent on to you." On the 26th February, 1850, Jas. Alex. Forbes again addresses Alexander Forbes on the subject of the title. He says: "I really did have more faith in the tact and ability of Castillero to perceive the important objects set forth in my memorandum of what was to be done nine months ago by that eccentric individual, and that with the powerful influence he was to have exercised, and the efficient aid that was to be lent him, he would meet with no obstacle to the attainment of the important documents explained in that memorandum. But Castillero has deceived himself; for he thought that boundaries were not necessary, as I shall presently show you. He succeeded in obtaining the grant of two sitios to himself in the mining possession of Santa Clara, while that very act of possession declares that the mine is situated on the land of José Berreyesa, five leagues distant from Santa Clara, &c. Without troubling you with what I have so many times written and explained to you verbally on the importance of the acquisition of the document, I will only say now what it must be; and it is this." The documents so often mentioned are again described with the impressive injunction that "both must be of the proper date, and placed in the proper governmental custody in Mexico." On the 2d March, 1850, Barron, Forbes & Co. inform James Alex. Forbes that "Mr. Barron and Don Andres Castillero are about to proceed to Mexico, and will attend to what you have recommended." On the 16th March, 1850, Alexander Forbes writes to James Alex. Forbes: "Mr. Barron and Castillero have gone off to Mexico, and I wrote them to-day respecting the document you know of, which, if possible. will be procured." This letter significantly concludes: "Let us have quicksilver and all will be well." On the 7th April, 1850, Alexander Forbes informs Jas. Alex. Forbes that "Mr. Barron and Castillero have arrived in Mexico, and have every prospect of finding the documents you are aware of." With this letter of the 16th March, 1850, all information as to the operations of Barron and Castillero in Mexico ceases. It is not disclosed what unexpected obstacle prevented their "finding" in Mexico the documents so much desired, or whether the doubts which Castillero entertained of "being able to accomplish the latter plan" (i. e. the grant of two sitios by definite boundaries) were unhappily realized.

Comment on the evidence afforded by these letters of a conspiracy to fabricate titles on the part, not of Jas. Alexander Forbes alone, as the answer admits, but of Alexander Forbes, and of Barron, Forbes & Co., is unnecessary. The full and specific instructions for the documents "to be procured," and for the "arrangement of their dates," originally given by Jas. Alex. Forbes, and so frequently referred to and repeated; the recital, in the letter of Alexander Forbes, of February 3d, 1850, of the boundaries indicated in the memorandum left by Jas. Alex. Forbes at Tepic; the positive statement by the former that the documents mentioned would, no doubt, be procured by Castillero; the doubts as to the best "plan" to be pursued in their fabrication; the announcement by Barron, Forbes & Co. that Mr. Barron and Castillero "are about to proceed to Mexico," and would attend "to what Jas. Alex. Forbes had recommended;" the significant instruction of Alexander Forbes to Jas. Alexander Forbes that "the document you know of" will, if possible, be procured; and, finally, the announcement that they had arrived in Mexico, and "had every prospect of finding the documents you are aware of,"—seem to establish beyond doubt, the existence of the conspiracy to fabricate titles as alleged in the bill. The nature of the suggestions of Jas. Alexander Forbes is as clear as language can make it. No answers from Alexander Forbes or from Barron, Forbes & Co. are produced in which those suggestions are rejected with the natural indignation of honesty. On the contrary, they are received and acted upon.

It is urged, however, that these letters themselves disclose that the Castillo Lanzas dispatch, now produced, was in existence at least as early as May 5th, 1847; and that therefore it must be regarded as genuine, whatever designs may have been subsequently entertained to fabricate or to "procure" other documents. We have seen that this document for the first time appears in the instrument of ratification by Castillero, dated at Mexico, December 17th, 1846; that no mention is made of it in the contract of McNamara with Alexander Forbes, made at Tepic, and dated November 28th of the same year, although it would seem from Alexander Forbes' letter that Castillero was then present, and must have then been in possession of the Lanzas dispatch if it was issued at the time it is dated. Admitting, then, that the dispatch referred to by James Alexander Forbes in his letter of the 5th May, 1847, is the same as that now produced, a copy of which is appended to the contract of the 17th December, it merely proves that the dispatch was in existence at the latter date, which was after the entire subversion of the Mexican authority in California. If, however, the letter of Alexander Forbes of March 28th, 1848, be genuine, it is an express admission that all the documents produced by Castillero in Mexico as his title to the mine and lands were obtained long after the occupation of California by the Americans. In that letter Mr. Forbes says: "But this interest renders it necessary for me to have the control of all the shares. in order that I may dispose of the whole whenever an opportunity may offer, and save myself from the heavy loss that would ensue should it unfortunately ·leak out that in fact all the documents procured by Castillero in Mexico

as his title to the mine and lands were all obtained long after the occupation of California by the Americans." "This unfortunate irregularity cannot easily be repaired, and serious objections might be made to our new act of possession." The authenticity of this letter is denied by the defendants. The original is not produced. It is stated by James Alexander Forbes to have been stolen from him. The existence of the original and the accuracy of the copy are sworn to by two witnesses, James Alexander Forbes and Robert Birnie. The latter swears that he was employed by one of the defendants to obtain from James Alexander Forbes any document that would be prejudicial to the mine, and he was informed that any such document would be liberally paid for. He accordingly made a copy of the letter of Alexander Forbes of March 28, 1848, which he gave to Mr. Barron, by whom he was paid at the time $200, and $200 a few days afterwards. That the copy now produced is the same as that left with Mr. Barron, and that the original was in the handwriting of Alexander Forbes, with which the witness is acquainted. James Alexander Forbes states that on the day on which he furnished a copy of this letter to be given to Mr. Barron, the letter was stolen from his carpet bag. The character of Mr. Birnie is unimpeached. No affidavits contradicting any of the statements made by him have been submitted. We are therefore not warranted in treating the allegation of the answer that this letter is forged, as sufficient to establish the fact.

We have seen from the letter of Alexander Forbes of the 1st December, 1849, and from his letter of 3d February, 1850, that at the date of the former there were at least two documents for the grant of lands to D. Andres Castillero: one, a notarial copy of which had been sent to James Alexander Forbes, which was directed at foot to the governor; the other, the original of which was deposited at Monterey, and which was "directly addressed to Don Andres," and therefore did not, in the opinion of Alexander Forbes, require a delivery by the governor to make it valid. This latter, as has been stated, has not been produced, nor is it pretended by the defendants that it ever existed. The fact that Mr. Forbes deposited at Monterey the original of a document which would thus seem to have been fabricated, may well suggest suspicions as to the genuineness of the other which is now produced.

In the exhibit attached to the deposition of Jose M. Lafragua, a copy of the Castillo Lanzas dispatch is found, together with a certificate of Jesus Vejar, a notary public, signed, as it recites, on the 1st March, 1850, "at the instance of Messrs. Barron, Forbes & Co." In this certificate the notary attests that the dispatch signed by Lanzas has "been respected under that signature, and obeyed by the Mexican authorities that governed in Upper California in the year 1846—according to insertions which said authorities made of said instrument in acts which they passed upon the subject of which they treat, and which I certify to have seen." Almost every statement contained in this certificate is admitted to be false. It is not pretended by the defendants that the dispatch of Lanzas was ever delivered to the governor, nor that it was even presented to, much less "respected and obeyed by the Mexican authorities of Upper California, in the year 1846." The "insertions of said instrument, made by those authorities, in acts which they passed upon the subject," and which the notary certifies to have seen, are purely imaginary. When a certificate of this character is procured from a Mexican notary, by some of the defendants in this case, and by them filed as an exhibit, the court is surely justified in regarding with suspicion, not only all documents which are authenticated in a similar manner, but also those the genuineness of which is assailed by other proofs.

We have thus far considered the case as it is presented by defendants, and as it appears from the letters admitted by themselves to be genuine, with the exception of one letter, the genuineness of which they deny. We have not thought it necessary to enter upon a minute examination of the mass of evidence which has been offered on either side. That duty properly belongs to the district court. Whether or not the letters are susceptible of an explanation consistent with the bona fides of the parties by whom they are written; whether or not the testimony of Lafragua, and other witnesses, the mention of this grant in his report, and the production of the document from the archives, and other evidence which may be offered hereafter, will be sufficient to satisfy that court of the genuineness of the titles produced by the defendants, we cannot now anticipate.

We have only entered upon the inquiry so far as was necessary to show, that the allegations of fraud in the bill are sustained by testimony sufficient to suggest grave suspicions as to the genuineness of the titles on which the defendants rely, and to justify the court in interposing, by injunction, in behalf of the legal title, to stay the destruction of the estate in controversy, pending the proceeding by which the validity of the title will finally be determined. Allusion has been made to the visit of Alexander Forbes to California in October, 1847. His proceedings on his arrival will now be adverted to, with a view of showing how the possession of the lands and mine now held by the defendants was acquired. In the letter of James Alexander Forbes to Eustace Barron, dated January 30, 1846, information is given that "Castillero, a sort of commissioner from the Mexican government, is working a quicksilver mine near the mission of Santa Clara." How long he

continued in California does not appear except from the affidavit of Forbes, in which it is stated that soon after entering into partnership with his associates, he went to Mexico and never returned. It also appears from the same affidavit, that Padre Real, one of the partners, was left in possession. On the 22d September, 1846, James Alexander Forbes writes to Alexander Forbes: "I am now in charge of the quicksilver mine, and am going to work it until I hear from Castillero, and am upon the point of striking a bargain for four shares." The motive for thus transferring the possession to James Alexander Forbes is stated by Mr. Forbes in his affidavit, and is in itself probable. It was to place the mine under cover of English protection, as the American forces were in possession of California, and Mr. Forbes was British vice-consul. The possession so delivered to Mr. Forbes comprised the mine itself, a log-cabin and shed, together with some old tools and utensils. The cabin was not occupied; but an Indian sometimes slept in the mine. Up to this time, 2,000 lbs. of quicksilver had been extracted. It is further stated by Forbes that this possession was kept up by Indians whom he sent to work there, although during the winter of 1846 it was for a time entirely abandoned. Such seems to have been the situation of the property up to the time when Alexander Forbes acquired his interest in it by his contract with McNamara, and dispatched Walkinshaw to California as his agent. To him, Mr. James Alexander Forbes transferred the possession, and assays and observations were commenced. The scarcity of operatives and the indolence of the Indians appear, however, to have prevented any considerable operations. In the month of October, 1847, Mr. Alexander Forbes arrived in California, with tools and laborers. On his arrival, explorations were immediately commenced, and on the 24th November, 1847, he announces the discovery of the "cinta," or vein of ores, the direction of which had been before entirely mistaken. On the 19th January, 1848, he writes to James Alexander Forbes, as follows: "I am very much obliged to you for your very prompt attention to the business in hand, and return the expediente immediately. I am much surprised at the result of your assay, and shall try what I have. It will, of course, be better to say nothing about it, particularly as I have already written to Monterey that there is no mine; nor does there appear to be any quantity of this kind of stuff. I hope soon to see the alcalde."

It is admitted in the answer that in January, 1848, the alcalde, James W. Weekes, made on the petition of Alexander Forbes, "a concession to him of the said mine, to correct and reform what had previously been given." The extent of the possession so given is stated by James Alexander Forbes to have been four pertenencias, or two hundred by eight hundred varas. It is to this "new act of possession" that Alexander Forbes probably alludes in his letter of 25th March, 1848, when he says "that serious objections may be made to its legality." Shortly after this possession was obtained, Mr. Forbes caused two square leagues to be surveyed around the mine, which in 1852 were put under fence, and have ever since been inclosed, and are now in possession of defendants. It is obvious that neither the act of Weekes, by which possession was given of a tract of eight hundred by two hundred varas, nor the act of Forbes himself, by which possession was taken of two square leagues, can have any validity against the United States, who had already acquired the legal title to and constructive possession of the land. It is not claimed that at the time of the first possession any measurement was made or boundaries fixed of the three thousand varas of which possession was alleged to have been given. No evidence has been offered to show that the possession up to the time of Weekes' measurement was other than that described in the affidavit of Mr. Forbes.

It has already been stated that the mining-title relied on by the defendants is claimed to be founded on a registry and act of possession by Pico the alcalde of San José. At the time when Weekes, the American alcalde, gave the possession of the mine and four pertinencies above referred to, Alexander Forbes also procured from him a certified copy of the expediente of the mine. This copy was prepared by James Alexander Forbes from an original furnished to him by Alexander Forbes; and to this copy the certificate of Weekes is annexed, certifying it to be "a faithful copy made, to the letter, from its original, the expediente of the mine of Santa Clara, or New Almaden, which exists in the archives under my charge." This certificate is admitted to be untrue, or at least inaccurate. The original from the archives of the alcalde has since been produced, and it shows that the copy certified by Weekes is neither "faithful" nor "to the letter." It is evident that the copy certified to by Weekes could neither have been prepared from nor compared with "any original existing in the archives under his charge." The original expediente now produced, is stated by Capt. Halleck, the superintendent of the mine, to have been found by himself in the office of Mr. Belden, mayor of San José, in the winter of 1851. If this document be indeed the original denouncement and registry of the mine, and if from the time of the denouncement it had remained on file as an original record in the alcalde's office, it is strange that the superintendent and counsel of the mine should so long have been ignorant of its existence.

In the suit brought in 1850 for the possession of the mine, by Berreyesa against James Alexander Forbes and Walkinshaw in the district court for Santa Clara county, a mo-

tion was made to require the defendants to produce "all papers of a pretended grant for two sitios, together with all other paper or papers connected with the title to said Almaden mine or the land upon which the same is situated, upon which defendants intend to found their claim to said land or said mines, &c." This motion was granted by the court, and said papers "or copies thereof" were ordered to be produced according to said motion. To this order the defendants answered by affidavit. In this affidavit they allege that they "have exercised all diligence to procure the said documents; but have been unable to do so, but expect soon to receive them from the parties in Mexico who hold them." They further aver "that the said documents and others which they have sent for in Mexico, are necessary to enable them to proceed to the trial of the cause; and they specify the following documents as absolutely necessary to them before they can proceed to trial": (1) "The original denouncement of the mine of New Almaden, and the judicial possession given of the same in the year 1845." (2) "The confirmation of said denouncement and possession by the supreme government in 1846, and prior to the late declaration of war by the United States against Mexico." (3) "The original grant of land, including said mining possession, made by the supreme government of Mexico prior to the declaration of war as aforesaid to the owners of said mine." This affidavit is sworn to by Mr. Halleck, one of the attorneys for defendants. It is evident that at this time, viz. December, 1850, Mr. Halleck could not have been aware that the original denouncement of the mine and judicial possession of the same given in the year 1845, was not in Mexico but on file among the archives of the alcalde's office to which it belonged. Nor could he have been aware that the concession of two leagues and the ratification of the mining possession were not, as implied in his affidavit, contained in two documents, but in one, viz., the dispatch of Castillo Lanzas. and that that dispatch was not dated "prior to the declaration of war by the United States," but ten days subsequently. But at this very time Mr. Jas. Alex. Forbes, one of the defendants in that suit, had already received a notarial copy of the Lanzas dispatch, addressed to the governor of California; and the original of another, addressed to Andres Castillero himself, he had been informed by Alexander Forbes had been deposited and registered in Monterey.

Up to the time of filing the petition of Castillero to the board of land-commissioners, the original expediente on file in the recorder's office seems to have escaped observation; for the exhibit filed with that petition is a copy of the document certified to by Weekes, and not a copy of that since produced from the recorder's office. We are aware that all these circumstances may be explained, and that the genuineness of this document is testified to by a number of witnesses. We have referred to the manner and time of its production to show that it has not that proof of genuineness which would be afforded by its admitted production from the archives of a Mexican office, transferred to us on the acquisition of the country.

The defendants have also produced in support of their title a large number of documents, purporting to be copies of originals on file in Mexico. They consist of official communications from various officers in Mexico, and purport to be the proceedings of those authorities, on the application of Castillero to the junta for the encouragement of mining, and which resulted, it is claimed, in the concession of the two sitios, as shown in the dispatch of Lanzas. None of these documents are authenticated under the great seal of Mexico. They are certified by the secretary or chief clerk of the departments in which the proceedings purport to have taken place They have been recently procured in Mexico, by an agent of the defendants. Whether documents alleged to exist in the archives of Mexico, can be regarded by the court if unauthenticated by the political power of that country under its great seal, it is not necessary now to decide. But as they have been obtained since the visit of Mr. Barron and Castillero to Mexico, and as the last injunction of James Alexander Forbes to Alexander Forbes was to have the documents referred to by him "of the proper date, and placed in the proper governmental custody in Mexico," we are at least justified in regarding such documents with suspicion unless authenticated in the most satisfactory manner. But especially should we call for such proof, when we remember that the documents purport to be a grant of land in California, dated May 23d, 1846, and that the Mexican government. in the original treaty of peace with the United States, declared in the 10th article, "that no grants whatever of lands in any of the territories ceded to the United States had been made since the 13th day of May, 1846."

We have thus examined at greater length than was intended the evidence on which the United States rely, to sustain the allegations of fraud which are made in the bill. The evidence considered has been chiefly that afforded by a correspondence admitted, with the exception of one letter, to be genuine; and that relating to the production of the expediente of the mine, in great part presented by the defendants themselves. The examination has been prosecuted not with a view of reaching any conclusion upon the question involved, but merely to ascertain whether the allegations of fraud in the bill which are not positively denied by the answer, have such a probable foundation as to justify the court in interfering by injunction, to preserve the property during the investigation in which the validity of the title will finally be determined.

The results of the examination may briefly be recapitulated as follows: It appears from the letters of the defendants, or those under whom they claim, that in the years 1847, 1848, 1849, and 1850, plans were discussed, and the design was entertained to procure documents from Mexico, the dates of which were to be "arranged" by Castillero, and which were to be "placed in the proper governmental custody in Mexico," and certified copies of which were to be sent on. That in May, 1850, Mr. Barron and Castillero proceeded to Mexico, "to attend to what had been recommended" by James Alexander Forbes. That documents have since been produced "from the proper governmental custody in Mexico," which are claimed to be a grant of two leagues of land and ratification of the mining possession. That these documents are not attested by the great seal of Mexico, or officially authenticated and recognized as genuine by the political power of that country. That they are dated subsequently to the 13th of May, 1846; and that the Mexican commissioners solemnly and repeatedly declared to the government of the United States, that no grants whatever of lands had been made in the territory of California since that date. That in December, 1849, two documents, of nearly similar import, appear to have been in existence; both of which could not have been genuine. That the original of one of these, which was deposited in Monterey, has disappeared; while the other is authenticated by the certificate of a notary obtained, as it recites, at the instance of some of the defendants, nearly every statement of which is untrue. That the expediente of the mine originally produced, and which was by Alexander Forbes procured, to be certified by Weekes, to be a "faithful copy to the letter" of the expediente on file in his office is not a copy of the documents since produced from that office. That this last document was not discovered until 1851, and up to that time its existence seems to have been unknown to those of the defendants who were most likely to have known of it, and to their agent and attorneys. That no measurement of the land alleged to have been granted by the alcalde, or demarkation of its boundaries, was effected during the continuance of the Mexican authority in this country; but the possession of the mine itself, which had been kept up with occasional interruptions, by Indian workmen, was transferred after the occupation of the country, to the British vice-consul, in order to place it under cover of the protection of the English government. That the first formal possession, by metes and bounds, of the tract now held by defendants, was taken long after the occupation of California by the American forces, and after the title of the United States had accrued. That at the time this possession was taken, the existence of valuable ores on the land was studiously concealed; and that two leagues of land were subsequently taken possession of and inclosed by the defendants without any authority whatever. It further appears that the United States are now seized of the legal title of the land, and that the title of the defendants, assuming it to be a genuine but an imperfect or equitable title, is one the validity of which, under the Mexican mining and colonization laws, is open to grave doubts. All these circumstances are, in our opinion, abundantly sufficient to show, not only that there is a substantial ground of controversy between the parties, but that the allegations of fraud in the bill, which are met with no positive denial in the answers, are sustained by proofs of the fraudulent designs of the parties, and of the manner in which the documents are produced, which leave the question of their genuineness open to grave doubts.

In such a case, where the substance of the estate and that which constitutes its chief value, is being wasted and carried off in enormous quantities, and where the threatened injury is to an extent far greater than can be compensated by damages, it seems to us clearly the duty of the court to preserve the property pending the litigation by which the right to it will be determined.